**Domingo CANTU, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 70739.**

Court of Criminal Appeals of Texas, En Banc.

June 3, 1992.

Rehearing Denied Sept. 30, 1992.

---

Gary A. Udashen (on appeal only), Dallas, for appellant.

John Vance, Dist. Atty. and K.A. Drew, J. Keck, M. Gandy, A. Beach and J. Sims, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appellant, Domingo Cantu, Jr., was convicted of capital murder. Tex.Penal Code § 19.03(a)(2). At the punishment phase of appellant's trial, the jury answered affirmatively the special issues set forth in Article 37.071(b) of the Texas Code of Criminal Procedure. The trial judge then sentenced appellant to death as required by Article 37.071(e). Direct appeal to this court was then automatic. Tex.Code Crim.Proc. art. 37.071(h). We will affirm.

Appellant raises thirty-four points of error. We will summarize these points briefly. Point of error number nine challenges the sufficiency of the evidence to support the jury's affirmative answer to the second special issue. In point of error twenty-three, appellant asserts Article 37.071 is unconstitutional because it sets forth no standards for this Court to determine sufficiency of the punishment evidence. In points of error thirty-two, thirty-three and thirty-four, appellant objects to the manner in which the grand jury was constituted. In point of error thirty-one, appellant argues that his statement should not have been admitted into evidence. Points of error twenty-five through twenty-nine allege

various error in the voir dire process. Point of error ten asserts *Batson* error. In point of error eleven, appellant alleges error stemming from the prosecutor's final argument. In point of error thirty, appellant asserts that the trial judge's failure to limit the definitions of "intentionally" and "knowingly" in the jury charge constituted reversible error. In point of error twenty-four, appellant alleges the entire capital punishment scheme is unconstitutional because it vests prosecutors with the sole discretion over which capital cases to prosecute. In points of error thirteen through eighteen, appellant asserts error in the trial court's failure to define the terms "deliberately," "criminal acts of violence," and "probability" in its charge to the jury. In points of error nineteen and twenty, appellant asserts that Article 37.071 is unconstitutional because it fails to guide the jury's consideration of unadjudicated extraneous offenses. In points of error twenty-one and twenty-two, appellant challenges the constitutionality of Article 37.071 on the ground it prohibits the trial court from informing the jury of the effect of its inability to come to an agreement on one of the special issues. Finally, points of error one through eight and twelve allege *Penry* error.

## I.

In point of error number nine, appellant asserts that the evidence was insufficient to support the affirmative answer that the jury made to special issue number two, pursuant to Article 37.071(b) of the Texas Code of Criminal Procedure.[1] Specifically, appellant contends that the nature of his prior criminal acts does not support the jury's conclusion that he constituted a continuing threat to society. Appellant further argues that the expert testimony pre-

---

1. At the time of Appellant's trial, Tex.Code Crim. Proc. art. 37.071(b) provided:

 On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

 (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

 (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

 (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

sented by the State was not credible, as it was based upon hypothetical questions, not upon actual examinations of appellant. In addition, appellant argues that evidence that he was under the influence of alcohol and cocaine at the time of the offense militates against an affirmative finding on future dangerousness. We briefly summarize the relevant evidence adduced at appellant's trial, as viewed in the light most favorable to the verdict.

The record reflects that appellant, a twenty-year-old Hispanic male, attacked the victim, a ninety-four-year-old woman, in the front yard of the victim's Dallas home on June 25, 1988. Appellant was apprehended near the home of the victim within minutes of her death. Appellant's clothes were bloody, and the arresting officer testified that he could smell alcohol on appellant's breath. Medical evidence showed that the cause of the victim's death was multiple injuries to the head. There was also evidence that blood and hair samples taken from appellant's clothing were consistent with those of the victim. Finally, appellant gave a statement to the Dallas Police Department in which he admitted sexually assaulting the victim and beating her head against the concrete.

At the punishment phase of the trial, the State introduced evidence of appellant's extensive criminal record. Charlotte Harris, a school official, testified from her personal knowledge of two thefts committed by appellant when he was twelve-years old. Officer Judith Skibinski of the Dallas Police Department testified that she arrested appellant twice when he was fifteen or sixteen years old for taking money from coin operated machines. Keith Dilling and Officer Winifred Richardson of the Dallas Police Department testified concerning a burglary committed by appellant in 1983. Richardson testified that appellant was belligerent when she arrested him for this offense. Officer James Byerly of the Dallas Police Department testified to observing the appellant make extensive efforts to evade an arrest for the burglary of a vehicle occurring October 16, 1985. Byerly testified that appellant refused to obey orders to halt and fought with the police officer

attempting to make the arrest. Appellant was placed on probation for this burglary. Subsequently this probation was revoked and appellant was sentenced to two years in prison. In addition, Officer David Vessels of the Dallas Police Department testified concerning an incident in which appellant violently resisted arrest. Also, there was evidence presented at trial that on the same day that appellant murdered the complainant, he had assaulted another woman at a bus stop, attempted to pull down her pants, and then stole her purse.

Other evidence was elicited concerning appellant's antisocial tendencies. For example, Dallas County Probation Officer Tammy Johnston testified about her experience as the probation officer assigned to appellant. She told of the numerous times that she had reported appellant's violations of the terms of his probation. She related that appellant failed to obtain employment, evaded drug rehabilitation, and, finally, fled from supervision completely. In addition the State presented expert testimony by Drs. Jeffrey Sigel and James Grigson, who testified that appellant had an "antisocial" personality and would constitute a continuing threat to society.

In addition to the evidence summarized above, the jury had the testimony of appellant himself, as well as the testimony of witnesses summoned by appellant. These witnesses included physician Dr. Terry Allen, social worker Steff Samuson, appellant's mother, and his girlfriend.

██ In resolving a sufficiency of the evidence issue, we must determine whether the evidence, when viewed in the light most favorable to the verdict, could lead a rational trier of fact to conclude beyond a reasonable doubt that the answer to special issue number two is "yes". *Valdez v. State*, 776 S.W.2d 162, 166 (Tex.Cr.App.1989). The jury is allowed to consider a number of factors in determining whether a defendant will be a continuing threat to society, including the following:

1. The circumstances of the capital offense;

2. The calculated nature of the defendant's conduct;

3. The deliberateness exhibited in the crime's execution;

4. The existence and severity of the defendant's previous offenses;

5. Whether the defendant was acting under duress or the domination of another at the time of the crime;

6. The defendant's age and personal circumstances;

7. Psychiatric evidence; and

8. Character evidence.

*Valdez,* supra; *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Cr.App.1987). We note also that in answering the special issues the jury is allowed to consider all the evidence which was admitted in both the guilt/innocence and punishment phases of the trial. *Santana v. State,* 714 S.W.2d 1 (Tex.Cr.App.1986). In addition, the circumstances of the offense alone, if severe enough, can sustain an affirmative answer to special issue number two. *Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Cr.App. 1986).

When sufficiency of the evidence is challenged, it is appropriate for this Court to examine other cases in which we have held that the State failed to present sufficient evidence to prove beyond a reasonable doubt that the defendant would be a continuing threat to society. Consequently, we have reviewed the cases cited in appellant's brief. See *Smith v. State,* 779 S.W.2d 417 (Tex.Cr.App.1989); *Huffman v. State,* 746 S.W.2d 212 (Tex.Cr.App. 1988); *Beltran v. State,* 728 S.W.2d 382 (Tex.Cr.App.1987); *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr.App.1987); *Roney v. State,* 632 S.W.2d 598 (Tex.Cr.App.1982); *Garcia v. State,* 626 S.W.2d 46 (Tex.Cr. App.1981). We note, however, that each case in which sufficiency of the evidence is challenged must be resolved on its own unique facts. *Santana v. State,* 714 S.W.2d 1.

We focus on the two cases on which appellant relies most heavily in his brief: *Garcia* and *Keeton.* In *Garcia,* supra, we held the evidence insufficient when the only evidence at punishment was the expert testimony of a psychologist who stated that it was his opinion that the defendant had an antisocial personality and would probably be dangerous and aggressive in the future. That situation is not analogous to this case, because in *Garcia* the psychologist's conclusions were based solely on thirty minutes of observing the defendant, after the defendant refused to talk with him. No tests were administered and no evidence was offered that the doctor knew anything about the defendant other than his half hour of observation. Nor did the doctor base his conclusions on a hypothetical situation mirroring the facts of the crime and the defendant's background, as was true in the instant case. Also important in *Garcia* was the fact that there was conflicting credible testimony as to whether the killing was intentional.

*Keeton,* supra, involved a murder committed during the course of robbery. The only evidence presented at punishment was the defendant's prior conviction for possession of marihuana, for which he was placed on probation, and the subsequent revocation of that probation. Because the State presented no character evidence, no psychiatric evidence, and no evidence that the defendant had committed prior violent acts, we concluded that there was insufficient evidence to support a finding that the defendant would pose a continuing threat to society. *Keeton v. State,* 724 S.W.2d at 64. We also note that in *Keeton* the murder, although senseless and unnecessary, was not of a particularly brutal or calculated nature.

After careful analysis, we find that this case is distinguishable from *Garcia, Keeton,* and the other cases cited by appellant. We first turn to the facts surrounding the murder itself. The murder in this case was not of the same character as those analyzed in *Garcia* and *Keeton,* inter alia, where the killing occurred spontaneously and without attendant brutality or calculation. In this case, appellant dragged the screaming 94-year-old victim across her patio and then threw her over a four-foot-high chain link fence. Appellant then sexually assaulted the victim both vaginally and

anally. During the course of the assault, appellant penetrated the victim with a large piece of wire, causing severe lacerations to her vagina. After raping the victim, appellant bashed the victim against the cement causing the fatal injuries to the victim's head. There were also multiple impact injuries to the victim's neck, trunk, and extremities.

As noted above, evidence of the crime itself can sustain an affirmative answer to the second special issue. After reviewing the evidence presented by the State, we find that this is just such a case. The jury had before it evidence which depicted an especially violent and barbaric crime, the facts of which, alone, could lead a rational trier of fact to conclude beyond a reasonable doubt that appellant would constitute a continuing threat to society.

In addition, there was copious other evidence from which a reasonable jury could conclude that the answer to the second special issue was "yes." First, appellant's prior criminal history indicated a violent nature. Appellant, on more than one occasion, reacted violently to law enforcement officials. The jury also had before it evidence that appellant had assaulted another woman just hours before he murdered the victim in this case. Finally, the jury had evidence from two expert witnesses that appellant was violent, antisocial, and would constitute a continuing threat to society. In sum, the jury had a sufficient basis from which to conclude that appellant would be a future threat to society. Point of error number nine is overruled.

## II.

■ In a related point of error, appellant claims that "Article 37.071, Texas Code of Criminal Procedure, is unconstitutional because there are no standards for the Court of Criminal Appeals to use in determining the sufficiency of the evidence under the special issues." Appellant offers no persuasive rationale for this contention other than the mere assertion that "in *Holland v. State*, 761 S.W.2d 307, 328 (Tex.Cr.App. 1988), the Court acknowledged its standard of review on the second special issue is unbridled." We feel appellant has misconstrued our decision in *Holland*, in which we merely set forth the relevant standard for reviewing evidentiary sufficiency. Indeed, as noted in our disposition of appellant's ninth point of error, the standard for determining sufficiency of the evidence at punishment is quite clear: whether the evidence, when viewed in the light most favorable to the verdict, could lead a rational trier of fact to find beyond a reasonable doubt that the answer to special issue number two is "yes". *Valdez v. State*, 776 S.W.2d 162, 166 (Tex.Cr.App.1989). We perceive no "unbridled discretion" or unconstitutional vagueness arising from this standard. Appellant's point of error twenty-three is overruled.

## III.

Points of error thirty-two, thirty-three and thirty-four attack the trial court's refusal to set aside the indictment. With respect to these points of error, the record reflects the following relevant facts: On July 14, 1988, an indictment was returned in Cause No. F–88–84029 by Dallas County Grand Jury "D". On August 25, 1988, the State notified appellant's trial counsel that it was seeking the reindictment of appellant. On August 26, 1988, Grand Jury "E" returned an indictment against appellant. Frank Finn was the foreman of that grand jury.[2] The cause number assigned to the reindictment was F–88–95689. The record clearly reflects that the two grand juries were assigned to different courts and were comprised of different grand jurors.

On September 9, 1988, appellant filed a motion in the trial court to set aside the second indictment, which was returned August 26, 1988. The motion alleged, among other things, that Grand Jury "E" had been illegally impaneled because two grand jury commissioners selected close relatives

---

**2.** Although not pertinent to our disposition of appellant's points of error, we note that the differences between the two indictments were relatively minor: the word "striking" was changed to "hitting"; the word "sidewalk" was changed to "concrete" and the word "aggravated" was added before the words "sexual assault."

to be grand jurors. The motion argued that this impanelment was in violation of the Nepotism Statute, Tex.Rev.Civ.Stat. art. 5996a.[3] Appellant's motion also alleged that the grand jury which returned the reindictment was not representative of "a broad cross-section of the population of the county, considering the factors of race, sex, and age." The motion further alleged the reindictment was violative of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as Article I, § 10 and Article III, § 56 of the Texas Constitution.

A hearing was held pursuant to appellant's motion on September 13, 1988. At this hearing evidence was adduced that two of the grand jury commissioners appointed grand jurors closely related to them. The testimony also revealed that of the twelve grand jurors that returned appellant's reindictment, ten were white males, one was a black male, and one was a white female. All the grand jurors but one were over the age of forty. The record also indicates that the members of this grand jury resided in various parts of Dallas County.

▇▇▇ In point of error 32, appellant argues that Grand Jury "E" was illegally impaneled because of violations of the Nepotism Statute. More specifically, appellant argues that

> the Grand Jury Commissioners violated the nepotism laws by appointing their relatives to the Grand Jury. The record shows that Grand Jury Commissioner J.E. Biggs appointed his brother, David

Biggs, to the Grand Jury [and that] Grand Jury Commissioner Frank Finn appointed his son, David Finn, to the Grand Jury.

The statute in question is Art. 5996a, V.A.C.S. This statute prohibits any officer of this State or any subdivision of this State from appointing any person related within the second degree by affinity or within the third degree by consanguinity to any position when the salary or fee for that position is being paid by public funds. Grand Jury Commissioners are officers of the State of Texas and the County of Dallas and Grand Jurors are paid for their services.

We are unpersuaded by appellant's argument. In *Bouchillon v. State*, 540 S.W.2d 319, 323 (Tex.Cr.App.1976), we summarily rejected the same argument, and we likewise reject it today. Simply put, a grand jury commissioner is not an "officer" as that term is used in the Nepotism Statute. Rather, commissioners are citizens appointed by district judges and paid a nominal fee. Tex.Code Crim.Proc. art. 19.01.[4]

Article 19.08 of the Texas Code of Criminal Procedure prescribes the qualifications of grand jurors. At the time Grand Jury "E" was impaneled and appellant re-indicted, Article 19.08 contained no nepotism provision whatsoever. In 1989, long after appellant had been tried and convicted for the offense in question, the Legislature added subsection six to Article 19.08 and prohibited persons from serving on grand juries with close relatives. Then, in 1991, the

3. Tex.Rev.Civ.Stat. art. 5996a, § 1(a) provides as follows:

> No officer in this State nor any officer of any district, county, city, precinct, school district, or other municipal subdivision of this State, nor any officer or member of any State[,] district, county, city, school district or other municipal board, or judge of any court, created by or under authority of any General or Special Law of this State, nor any member of the Legislature, shall appoint, or vote for, or confirm the appointment to any office, position, clerkship, employment or duty, of any person related within the second degree by affinity or within the third degree by consanguinity to the person so appointing or so voting, or to any other member of any such board, the Legislature, or court of which such

> person so appointing or voting may be a member, when the salary, fees, or other compensation of such appointee is to be paid for, directly or indirectly, out of or from public funds or fees of office of any kind or character whatsoever.

4. Moreover, we note that the sole remedy for violations of the Nepotism Statute is set forth in Tex.Rev.Civ.Stat. art. 5996f: "Whoever violates any provision of the five preceding articles shall be guilty of a misdemeanor involving official misconduct, and shall be fined not less than one hundred nor more than one thousand dollars." Thus, even assuming the grand jury commissioners violated the Nepotism Statute, this would only serve to subject the commissioners to criminal liability.

Legislature amended subsection six and added a reference to the definitional section of the Nepotism Statute.[5] At no time, however, has Article 19.08 ever contained a substantive nepotism provision. Nor has any other portion of the Code contained a substantive nepotism provision concerning grand jurors. Point of error 32 is overruled.

Appellant's thirty-third point of error asserts that: "The trial court erred in overruling Appellant's Motion to Set Aside indictment based upon unconstitutional racial discrimination in the selection of the Grand Jury that indicted him." Appellant claims that (1) there were no Hispanics that sat on the grand jury, and (2) there was a significant disparity between the representation of blacks, women and Hispanics on the grand jury as compared to their proportionate population in Dallas County. We agree with appellant's factual assertions; however, we find that the facts of the instant case fall short of establishing the requisite showing of racial discrimination.

Without doubt, it is violative of federal equal protection law to try a defendant of a particular race under an indictment issued by a grand jury from which all persons of the defendant's race have been excluded solely because of their race.[6] *Muniz v. State*, 672 S.W.2d 804, 809 (Tex. Cr.App.1984), citing *Hernandez v. State*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); see also *Rose v. Mitchell*, 443 U.S.

545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1978). In *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), however, the Supreme Court held that a defendant alleging such an equal protection violation has the burden of proving the following:

1. the group allegedly underrepresented is a recognizable and distinct class;

2. a comparison of the percentage population of this class to the percentage of this class called to serve on the grand jury over a significant period of time reveals identifiable underrepresentation; and

3. the system of selecting grand jurors is susceptible to abuse or is not race neutral.

We hold that appellant has made a prima facie showing of the first and third prongs of this test. See *Muniz*, supra, at 809. However, he has not satisfied the second prong of the test by statistically showing the requisite racial disparity.

The record below reveals that Hispanics constituted between 9.9% and 10.9% of the population of Dallas County at the time of appellant's indictment. Further expert testimony demonstrated that during the three years prior to appellant's indictment, Hispanics made up approximately 10.1% of the grand jurors impaneled. Based on this comparison, we find no systematic underrepresentation of Hispanics on Dallas

---

5. Article 19.08 now provides in relevant part:

No person shall be selected or serve as a grand juror who does not possess the following qualifications:

\* \* \* \* \* \*

6. He must not be related within the third degree of consanguinity or second degree of affinity, as determined under Article 5996h, Revised Statutes, to any person selected to serve or serving on the same grand jury[.]

6. We note that appellant's assertion that blacks and women were also underrepresented has no relevance to his equal protection claim. Appellant's contention relies solely on *Cassell v. State of Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), in which the Supreme Court found racial discrimination given the fact that the grand jury commissioners testified they selected only those grand jurors with whom they were personally acquainted. Because the commissioners

(all white males) were not personally familiar with any qualified blacks and did not attempt to familiarize themselves with the qualifications of blacks whom they did not personally know, the Court found impermissible discrimination. We find appellant's reliance on *Cassell* misplaced for two reasons. First, the record in this case does not demonstrate that the grand jury commissioners selected *only* grand jurors with whom they were personally acquainted. Second, *Cassell*, like *Castaneda*, dealt only with the discrimination of members of the defendant's racial class. Thus, *Cassell* cannot be read as expansively as appellant would desire, to wit: as extending the holding in that case to encompass the discrimination of members of identifiable classes to which the appellant is not a member. See *Bird v. State*, 692 S.W.2d 65, 77–78 (Tex.Cr. App.1985) (holding that such a claim was applicable only to a class to which the defendant belonged).

County grand juries. The fact that appellant was indicted by a grand jury that did not contain an Hispanic was quite possibly simply an anomaly. Because appellant has failed to satisfy the second prong of the test set forth in *Castaneda*, his point of error thirty-three is overruled.

 In appellant's thirty-fourth point of error, he predicates error on the grand jury commissioners' violation of Article 19.06 of the Texas Code of Criminal Procedure,[7] in that Hispanics, women, and persons under age forty were underrepresented in the particular grand jury that indicted appellant. However, appellant offered no evidence that these groups had been systematically underrepresented over a significant period of time. Given this fact, we conclude appellant's contention is without merit. Appellant's point of error thirty-four is overruled.

### IV.

In point of error number thirty-one, appellant argues that error was committed by the trial court in refusing to exclude from evidence confessions made by appellant to police officers. The record reflects that shortly before 8:00 a.m. on June 25, 1988, Fred Oakes, a neighbor of the victim, heard cries of help from her. He then witnessed the victim being dragged across her patio by a Hispanic man, at which time he called 911. Officer Leonard Garza of the Dallas Police Department, responding to this emergency dispatch call, apprehended appellant just minutes later. Appellant, who was covered in blood and feces and smelled of alcohol, matched the description given by Oakes.

Appellant was arrested, handcuffed, and detained in the back seat of a patrol car while law enforcement personnel investigated the crime scene. At the time of his arrest, appellant was advised of his rights pursuant to Article 38.22, § 2(a) of the Tex-

as Code of Criminal Procedure. The detention of appellant at the crime scene lasted approximately two hours, during which time a police investigator took hair samples from appellant as he sat in the car. Appellant was then transported to Lew Sterrett Justice Center for processing. At the Justice Center, appellant was attired in jail whites. At this time his clothes were removed and tagged. Appellant was further processed and then transported to the Crimes Against Persons division.

At approximately 11:30 a.m., appellant was interviewed by Thomas Belcher, a homicide detective with the Dallas Police Department. Belcher testified at trial that he first warned appellant in certain admonitory language similar to that found in Article 38.22, § 2(a). Belcher then wrote down verbatim appellant's statement, had it reduced to typewritten form, and then read the statement as well as the requisite warnings to appellant, who then signed the statement. Other evidence adduced at trial revealed that prior to signing the initial statement, appellant had been thoroughly advised of his rights five times.

Immediately after appellant signed the first typewritten statement, a second statement was taken from him by Belcher. According to the testimony of Belcher, the same procedure was followed and the same admonitions were given as in the taking and recording of the prior statement. At approximately 4:30 p.m., appellant was taken before a magistrate and arraigned.

On October 24, 1988, the court conducted a pretrial hearing on whether appellant's statements were voluntary, pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). At the hearing, appellant objected to the admission of the statements on the ground that he was not presented before a magistrate without unnecessary delay, as required by Articles

---

7. Tex.Code Crim.Proc. art. 19.06, which provides in relevant part:

 \* \* \* \* \* \*

The commissioners shall, to the extent possible, select grand jurors who the commission-

ers determine represent a broad cross-section of the population, considering the factors of race, sex, and age.

14.06[8] and 15.17[9] of the Texas Code of Criminal Procedure. Appellant also objected on other grounds not germane to the point of error now before us. At the conclusion of the hearing, the trial judge overruled appellant's objections to the admissibility of the statements. Both of appellant's statements were subsequently admitted in evidence at trial.

 As stated, Article 15.17 of the Texas Code of Criminal Procedure requires that one making an arrest take the arrestee before a magistrate without "unnecessary delay."[10] It is well-settled, however, that the failure to take an arrestee before a magistrate in a timely manner will not invalidate a confession unless there is proof of a causal connection between the delay and the confession. *Boyd v. State*, 811 S.W.2d 105 (Tex.Cr.App.1991); *Ex Parte Stansbery*, 702 S.W.2d 643 (Tex.Cr.App. 1986). Appellant has failed to demonstrate any connection between the State's failure to take him before a magistrate and the statements he gave to Officer Belcher. To the contrary, the record is replete with evidence that any delay in taking appellant before a magistrate was due to reasonable investigative and processing procedures necessitated by the particular facts of this case.

Moreover, an unreasonable delay in presenting an arrestee before a magistrate will not vitiate an otherwise voluntary confession if the arrestee was properly advised of his *Miranda* rights. *Boyd*, supra; see also *Von Byrd v. State*, 569 S.W.2d 883, 893 (Tex.Cr.App.1978). The record reflects

8. Article 14.06 provides:
 In each case enumerated in this Code, the person making the arrest shall take the person arrested or have him taken without unnecessary delay before the magistrate who may have ordered the arrest, before some magistrate of the county where the arrest was made without an order, or, if necessary to provide more expeditiously to the person arrest the warnings described by Article 15.17 of this Code, before a magistrate in a county bordering the county in which the arrest was made. The magistrate shall immediately perform the duties described in Article 15.17 of this Code.

9. Article 15.17 likewise provides that an arrestee shall be taken to a magistrate without unnecessary delay.

10. Recently, the United States Supreme Court held that, as a general rule, a forty-eight hour

that appellant was properly advised numerous times of his rights by Officer Belcher and others. Based on the foregoing analysis, we find that the detention of appellant did not constitute an "unreasonable delay" under Articles 14.06 and 15.17. Appellant's point of error thirty-one is overruled.

## V.

In points of error twenty-five through twenty-nine, appellant alleges various errors in the voir dire. In points twenty-five and twenty-six, appellant argues that the trial court abused its discretion in ruling on challenges for cause pursuant to Tex.Code Crim.Proc. art. 35.16. We address these points in the order raised in appellant's brief.

In point of error twenty-five, appellant claims that the trial court abused its discretion in sustaining the State's challenge for cause levied against prospective juror Jacqueline Holloway. The relevant portion of the venireperson's testimony is as follows:

[BY THE PROSECUTOR]: Ma'am, could you hold us to what the law says, and that is could you say all you have to do is prove it to me beyond a reasonable doubt, or are you going to tell us that you're going to have to be something more than a reasonable doubt, that you're going to have to be absolutely certain?

A: Absolutely certain.

detention without presentment in front of a neutral magistrate is not an "unnecessary delay" as a matter of constitutional law. *County of Riverside v. McLaughlin*, — U.S. —, 111 S.Ct. 1661, 1665, 114 L.Ed.2d 49 (1991); see also, *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). *McLaughlin*, however, was concerned solely with an accused's fourth amendment right to prompt presentment for a probable cause determination. Articles 14.06 and 15.17 concern only the presentment of an accused before a magistrate in order to apprise the accused of his various rights. Curiously enough, nowhere in these Code provisions is a requirement that a probable cause be made promptly, or at all. Because appellant does not complain of any delay regarding a probable cause determination in his case, we need not, at this time, decide the impact of *McLaughlin* on the duties of a magistrate under Article 15.17.

Q: Okay. And you realize, ma'am, that the law says—and you have a right, like the judge told you have a right to disagree with any law that we have here, and we respect the way you feel. Okay? But because of the nature of this case or because it is a capital murder case—okay?—are you telling us that beyond a reasonable doubt is just not good enough in this kind of case, that you're going to have to be more than just a reasonable doubt, you're going to have to be absolutely, 100 percent certain?

A: Yes.

Q: Okay. Is there any question in your mind about that at all, ma'am?

A: About being 100 percent sure?

Q: Yes, ma'am.

A: No.

When questioned by appellant, the venireperson stated as follows:

[BY DEFENSE COUNSEL]: Okay. So is there any question in your mind that you would not hold the State to the proof beyond a reasonable doubt to you?

A: Is there any what, now?

Q: Would you hold them to prove the case to you beyond every reasonable doubt you have?

A: Yes.

Finally, the trial judge intervened and questioned the venireperson:

[BY THE COURT]: And so the question I need to know—and don't feel bad about it, sometimes lawyers start talking to you and one gets you to say one thing and another gets you to saying something else, but you did give two different answers.

A: Uh-huh.

Q: And all I need to know from you, very simply is, in a death penalty case, which would you require, proof beyond a reasonable doubt, which is what the law requires, or would you require, since it is a death penalty case, absolute certainty, proof beyond any doubt whatsoever?

A: I would require absolute certainty.

Ultimately, the trial judge sustained the State's challenge for cause, pursuant to Tex.Code Crim.Proc. art. 35.16(b)(3).[11]

■ In general, when reviewing the propriety of a trial judge's ruling on voir dire challenges, we recognize the need for appellate courts to defer to the trial judge, who was in the best position to witness the responses of the prospective jurors and to evaluate their demeanor. As the United States Supreme Court held in *Wainwright v. Witt*, 469 U.S. 412, 424–28, 105 S.Ct. 844, 852–54, 83 L.Ed.2d 841 (1985):

> [D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of catechism. What common sense should have realized experience has proved: many veniremen cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully apply the law.... [D]eference must be paid to the trial judge who sees and hears the juror.... [T]he question whether a venireperson is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireperson's state of mind. We also noted that such a finding is based upon a determination of demeanor and credibility that are peculiarly within the trial court's province. Such determinations are entitled to deference even on direct review.

See also *DeBlanc v. State*, 799 S.W.2d 701, 717 (Tex.Cr.App.1990).

---

**11.** Article 35.16(b) states in relevant part:
A challenge for cause may be made by the State for any of the following reasons:

 * \* \* \* \* \*

(3) That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

In reviewing a decision by the trial judge to sustain a challenge for cause, the standard of review is whether the totality of the voir dire testimony supports the trial judge's implied finding of fact that the prospective juror is unable to take the requisite oath and follow the law as given by the trial judge. *Goodwin v. State*, 799 S.W.2d 719, 731 (Tex.Cr.App.1990). Moreover, when analyzing the propriety of a trial judge's decision to sustain a challenge for cause, the reviewing court must recognize that it is faced with only a cold record. Perforce, when undertaking an abuse of discretion review, the juror's bias need not be proven with "unmistakable clarity":

> Despite ... lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... this is why deference must be paid to the trial judge who sees and hears the jurors.

*Witt*, 469 U.S. at 425–26, 105 S.Ct. at 852–53; see also *Andrews v. State*, 744 S.W.2d 40 (Tex.Cr.App.1987). Therefore, this Court grants considerable latitude to the trial judge, who had the opportunity to directly observe the demeanor of the venireperson. *Foster v. State*, 779 S.W.2d 845, 852 (Tex.Cr.App.1989).

This need for deference is especially critical when the reviewing court is faced with a record that demonstrates uncertainty in a venireperson's responses. In *Goodwin,* we held that:

> [W]hen faced with the ambiguous voir dire record of a venireperson who indicates both an inability to follow the law because of her views on the death penalty, and an ability to follow her oath and the law as instructed by the court, great deference should be given to the decision of the trial judge. A trial court's ruling on these issues should be reversed "only when the record shows a clear abuse of discretion."

799 S.W.2d at 731, quoting *Davis v. State*, 782 S.W.2d 211, 216 (Tex.Cr.App.1989); see also *Perillo v. State*, 758 S.W.2d 567, 576–77 (Tex.Cr.App.1988) (venireperson who repeatedly equivocated was properly excluded for cause); *Ransom v. State*, 789 S.W.2d 572, 582–83 (Tex.Cr.App.1989). Thus, we will reverse such a decision only for clear abuse of discretion; i.e., only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. See *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Cr.App.1990) (op. on reh'g); *Ransom v. State*, 789 S.W.2d 572, 582 (Tex.Cr.App.1989), cert. denied, 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990). This is not such a case.

Venireperson Holloway's answers, when considered in their entirety, clearly support the finding of the trial judge that the venireperson had a manifest bias against a phase of the law on which the State was entitled to rely, to wit: she would require a level of proof higher than "beyond a reasonable doubt." See *Jacobs v. State*, 787 S.W.2d 397 (Tex.Cr.App.1990); *Crane v. State*, 786 S.W.2d 338 (Tex.Cr.App.1990). There was also testimony by the venireperson that before she could find appellant guilty of capital murder, she would require that the murder be premeditated, not merely intentional. Her definition of premeditation was "[t]wo or three hours." Based on the entirety of the venireperson's testimony, the trial judge's ruling that she was subject to challenge for cause under Article 35.16(b)(3) was reasonable. Because the judge did not abuse his discretion in sustaining the State's challenge for cause, appellant's point of error number twenty-five is overruled.

Appellant, in point of error number twenty-six, argues that the trial judge erred in denying his challenge for cause of venireperson Robert L. Jennings based on the venireperson's statements that he would not hold the State to its burden of proving all of the elements of the offense beyond a reasonable doubt.

As an initial matter, the State argues that appellant failed to preserve this point of error for review. We agree. At the conclusion of the voir dire, appellant challenged the venireman for cause. The trial judge overruled the challenge and the

venireperson was then accepted by both sides, and ultimately sat on the jury. At the time appellant accepted this venireperson, he had not exercised all his peremptory strikes. It is well-established that in order to preserve error, an appellant must demonstrate "that he [was] forced to exercise a peremptory challenge to excuse the prospective juror to whom the defendant's challenge for cause should have been sustained." *Felder v. State*, 758 S.W.2d 760 (Tex.Cr.App.1988). In this case, appellant failed to exercise a peremptory challenge against venireperson Jennings, thereby failing to preserve error on this issue. In the interests of justice, however, we will address the substantive merits of appellant's point of error.

■ Specifically, appellant points to the following statements, made during appellant's examination of the venireperson:

Q: All right. So [the indictment is] saying back on June 25, 1988, in Dallas County, Texas, that the defendant did intentionally cause the death of [the victim], hereinafter called the deceased, by hitting the head of the deceased against concrete. Okay?

And the Defendant intentionally did cause the death of the deceased while the said Defendant was in the course of committing and attempting to commit the offense of aggravated sexual assault. Okay?

Now, that's what they've charged him with. Do you understand that the State has got to prove each and every one of those elements—

A: Yes.

Q: —beyond a reasonable doubt. If they fail to prove any one of those elements, it's your duty to return a verdict of not guilty.

Would you be able to do that if, for instance, if they—or the evidence showed you—well, let's just pick a phrase—that the deceased—if the evidence showed you that the deceased was killed by a tree limb instead of by concrete, how would you feel about that?

A: Well, it would depend on the rest of it. If you kill somebody with a claw hammer or a sledge hammer,—

Q: Uh-huh.

A: —it would make very little difference.

Q: Well, what if the State alleged in that case, though, it was a claw hammer and instead it turned out to be a sledge hammer?

A: Well, as a juror I would probably be hard put to make a—to sway my opinion much one way or the other on that. I would look at what happened and what instrument was used.

Q: All right. Well, let me—I'm afraid we've got to talk about this a little more. What if—now, you see looking down further on, it said while the said Defendant was in the course of committing and attempting to commit the offenses of aggravated sexual assault. What if it turns out he's attempting to commit the offense of burglary, would that make a difference to you?

A: No.

Q: Okay. Are you telling me, then, that you would look at the whole sum of evidence and if you felt that he did cause the death of [the victim] by killing her in some manner that you would return a verdict of guilty regardless of what the State had actually put in the indictment.

A: Unless there were mitigating circumstances, yes.

Q: Okay. Now, are you sure about that?

A: I feel that way.

Although the venireperson's initial testimony indicated that he might find appellant guilty regardless of whether the State proved the elements of the offense as alleged in the indictment, a fair reading of these complained-of statements indicates confusion on the part of the venireperson. In addition, upon further questioning by the trial judge, the venireperson clearly stated that he could follow the law and hold the State to its burden of proof:

[BY THE COURT]: Don't let this come as any great shock to you, but with two lawyers asking you questions for about

an hour it's kind of hard to sit up there and not give some answers—there were some answers that were given that I'm unclear about, and just the law requires me to in the procedure that everyone's agreed to, they don't get to ask any questions, go back and clear anything up. I'm the one to do that.

So let me ask you a few things. First of all, you indicated at one point in your testimony that if the indictment—they were talking to you about the indictment and whether some aspect of the indictment wasn't proved but nevertheless you still believed that the acts committed by the defendant caused the death of [the victim] that—and I believe you were talking about a claw hammer and talking about a tree limb rather than hitting her head on concrete like it says.

I need to follow it up and ask you what you mean, because later on you indicated, and I write it down in my notes because it stuck out, that if you had to be convinced beyond a reasonable doubt that you had to be sure that the State proved these points—I assume by that you meant this indictment. Now, let me say this to you:

This man's on trial for his very life. Close only counts in horseshoes and hand-grenades.

\* \* \* \* \* \*

The question I have for you is, and again, no right or wrong answers, I'm not trying to change your mind, I just need to understand what you really feel. You gave me two answers that seemed to be conflicting. You indicated that if one of these points, albeit minor, were not proven, that—and you believed nevertheless that, for example, that some technical aspect of the indictment, let's say they proved it was in Harris County, that this happened in Houston and we're up here in a Dallas court, it really didn't happen in Dallas.

I'll tell you now, if there's an absence of evidence on one of these points, I'm going to instruct—first of all, let me ask this question: If there's an absence of evidence on one of these points, the in-

dictment isn't really what's going to control the jury. What's going to control the jury is the written instructions I give. If there is no evidence on the point, I'm going to instruct you to find the defendant not guilty.

Can you follow my instructions and even if you think I'm wrong and he killed somebody and he ought to be punished for it, are you still going to find him not guilty if I tell you to?
A: Yes, I could understand that.
Q: All right. Now, when you said that they failed to prove to you to your satisfaction—let's assume a case that they present evidence that her head was struck against concrete, and they present evidence that the way the lady died was that she got hit in the head with a claw hammer. And let's assume after hearing that evidence you believed the defendant's really right about that, yeah, he—and not that that's their position, it's not. The man's pled not guilty and that's what he's doing before this jury.

But let's assume that you believe that she was killed by being hit in the head with a hammer. And you really believed that. But the State has alleged, and in the charge you'll be instructed specifically that in order to find him guilty you have to believe that she was killed by striking her head against concrete. Are you going to follow the law and the evidence, and even though you believe that he may have done the killing with a claw hammer, are you going to find him guilty of hitting her head against concrete? I know that's a long way of getting—
A: No.
Q: No, you're not, you're not going to—okay. And that's what you meant when you said that you would require the State to prove the case to you beyond a reasonable doubt and that you had to be sure as to each one of these elements?
A: Right.

\* \* \* \* \* \*

[BY THE COURT]: Okay. Based—now let the record reflect there were some pretrial agreements made, that rather

than going back and forth with equivocating jurors and having the lawyers go back and forth in attempts to rehabilitate, that the Court would, to the best of its ability, try to clear up any equivocations, and then after that we would ride with whatever answers he gave me.

I tried to the best of my ability to do that, and the record will reflect what it reflects.

Based upon the answers he gave me, he told me, when I specifically asked him about that point, that he would follow the law if I gave an instructed verdict, which what we're talking about here, as everyone knows it's not what the indictment says but what the charge says, whether he would follow what was in the charge, and he said that he would do that.

And based upon the totality of his answers that he gave when I was questioning him, I'm going to deny the challenge for cause.

Applying the analysis set forth in our disposition of appellant's previous point of error, we hold that the trial judge did not abuse his discretion in finding this venireperson capable of following the trial judge's instructions and the law. Consequently, appellant's point of error twenty-six is overruled.

 In points of error twenty-seven and twenty-eight, appellant contends that the trial court erred in disqualifying two venirepersons because both had misdemeanor theft convictions. The trial judge's rulings were based on Article 35.16(a), which provides:

A challenge for cause is an objection to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

\* \* \* \* \* \*

2. That he has been convicted of theft or any felony; Article 35.16 must be read in conjunction with Article 35.19,[12] which makes it explicit that a prospective juror who has been convicted of theft is absolutely disqualified from jury service. See *Thomas v. State*, 796 S.W.2d 196 (Tex.Cr. App.1990). The trial judge therefore properly excluded the venirepersons.[13] Appel-

---

**12.** Article 35.19 of the Texas Code of Criminal Procedure provides: "No juror shall be impaneled when it appears that he is subject to the second, third or fourth cause of challenge in Article 35.16, though both parties may consent."

**13.** Appellant contends that the trial judge's reliance on Article 35.16(a)(2) was erroneous because that article conflicts with Tex. Gov't Code § 62.102, which provides:

A person is qualified to serve as a petit juror unless he:

\* \* \* \* \* \*

(7) has not been convicted of a felony; and
(8) is not under indictment or other legal accusation of misdemeanor or felony theft or any other felony.

Appellant contends that because Section 62.102 was enacted subsequent to Article 35.16 it is the controlling authority. We disagree, and hold that the provisions of Articles 35.16 and 35.19 control juror qualification in criminal cases. See *Thomas v. State*, 796 S.W.2d 196.

Section 62.102 is a general provision relating to many types of jury service, while Article 35.16 is a special provision, relating only to jury service in criminal cases. Whenever a general provision conflicts with a special or local provision, the provisions should be construed together, if possible, so that both can be given effect.

Tex.Gov't Code § 311.026(a). If there exists irreconcilable conflict between the general and special provisions, the local provision prevails. Tex.Gov't Code § 311.026(b). An exception to this general principle exists when both (1) the general provision is enacted after the special or local provision, *and* (2) it is manifestly intended that the general provision prevail over the special or local provision. Id.

In the case at bar, the trial judge reconciled the two provisions as follows:

[BY THE COURT]: [T]he Government Code is a floor not a ceiling and that in a trial of a criminal case, particularly a case as we have here, that the Texas Code of Criminal Procedure must take precedence. And furthermore, it would be more general as to what we're doing here, the Government Code relying to jurors in both civil and criminal cases.

We agree with this analysis. We find that the two provisions are capable of reconciliation and do not pose the type of irreconcilable conflict addressed in Section 311.026(b). Section 62.102 encompasses all types of trials and is a minimal threshold of juror qualifications. By contrast, Article 35.16 stated additional disqualifying factors to be considered in criminal cases. In addition, we find that even if the two provisions were incapable of harmonization, Section 62.-

lant's points of error twenty-seven and twenty-eight are overruled.

In point of error number twenty-nine, appellant contends that the trial court erred in denying him additional time to question venireperson Barry Harrington. The record reveals that both sides had agreed to limit individual voir dire of prospective jurors to thirty minutes per side for each venireperson. The parties had further agreed to allow the trial judge to clear up any ambiguities arising during voir dire, rather than engage in extensive and time consuming attempts at rehabilitation.

The record reveals that venireperson Harrington was questioned for ten to fifteen minutes on the issue of voluntary intoxication. Near the conclusion of appellant's voir dire of the venireperson the following exchange occurred:

[BY DEFENSE COUNSEL]: I'm saying too bad. It [voluntary intoxication] don't count for anything on the issue of guilt or innocence, so save it until punishment, and I think it is a voluntary judgment they made. I'm not arguing with it, there is a voluntary intoxication. If you exercise any voluntary [sic] or decision to make the process to take a drug, even if the rest of it were outside of your wildest imagination, you can't come and ask to be relieved of a criminal responsibility; you with me?

A: All right, let me see if I am with you. It couldn't have any bearing on the first part of the trial, of guilty or not guilty, but it can have a bearing on the second part of the trial on punishment?

Q: Exactly.

A: I am with you.

Q: Do you understand?

[BY THE COURT]: I will let you finish the questions. If you heard of a situation where you believed that the defendant was voluntarily intoxicated and temporarily insane due to it, could you see how it, and could you consider it an issue of whether he acted deliberately or not?

A: Yes.

[BY THE COURT]: I will give you one last question. You're out of time. Go ahead and finish up this area, if you would.

[BY DEFENSE COUNSEL]: That is what I want to do. I understand if the question that I'm asking you is, could you consider it, voluntary intoxication, as defined on the issue in question number one?

A: Yes.

Q: And if you believed that it resulted in and should let the question number one be answered no, and the defendant staying at the life sentence, would you answer it that way?

A: Yes.

Q: It can also apply to question number two. Are you with me on what question number two says?

A: Well, I'm with you on what question number two says, but are we back to voluntary intoxication?

Q: Yes, voluntary intoxication. You might feel like that was mitigating or should lead you to answer question number two no. Do you see what I'm saying? You might think that this is a—situation in which he took drugs and got temporarily insane. And he committed the offense. But in terms of there being a problem about that he would commit a criminal act of violence in the future due to the fact of this case, I think it ought to be answered no.

A: I don't know how in the world we can make that determination. We don't know the past input on the defendant's record of use of abusive drugs or alcohol. You say that it has been proven that he used it in this incident, or are you saying that he is going to use drugs or alcohol in the future and, because of that, commits crimes?

Q: Well, you're asking us to supply more facts than I can at this stage of the trial, and I'm just trying to ask you wouldn't—if the voluntary intoxication

102 is not manifestly intended to displace the relevant provisions of Article 35.16, and therefore the specific provisions of Article 35.16

would prevail in criminal cases. Articles 35.16 and 35.19 are therefore controlling in this case.

case was proven to you, could you apply it to the questions asked in number two there and consider it for purposes of answering the questions?

A: Well, I guess I can, I'm not quite sure.

Q: You really don't understand this area too much?

A: I don't—yes, I do.

[BY THE COURT]: Excuse me.

[BY DEFENSE COUNSEL]: So, I guess the judge is going to take it from this point so I won't ask anything else. Okay, thank you, sir.

&ast; &ast; &ast; &ast; &ast; &ast;

[BY THE COURT]: All you have to be is a qualified juror. If I hear the evidence and I believe it, I will follow the law, and taking into consideration in mitigating punishment in the contents [sic] of the death penalty, these would be answered in those two questions. Would you do that?

A: Yes.

At this point, the venireperson was accepted by the State. Appellant challenged the venireperson on two grounds, one of which was that "he doesn't understand what voluntary intoxication is, much less how he can mitigate the punishment or apply it to one and/or two, and for those reasons, we are going to challenge this juror for cause." The judge overruled appellant's challenge, finding that when the venireperson's testimony was taken as a whole, "he could follow the law with respect to applying voluntary intoxication in answering [the special punishment] questions." After obtaining an adverse ruling from the trial judge on its challenge, appellant requested more time to question the venireperson on the application of voluntary intoxication as applied to special issue two. The trial judge refused to allow ap-

pellant more time to question the venireperson.

The conduct of voir dire rests largely within the sound discretion of the trial court. *Mays v. State*, 726 S.W.2d 937 (Tex.Cr.App.1986). Thus, a trial judge may impose reasonable time limits on the voir dire process. Such time limitations are reviewed under an abuse of discretion standard. *Boyd v. State*, 811 S.W.2d 105 (Tex. Cr.App.1991); *Faulder v. State*, 745 S.W.2d 327, 334 (Tex.Cr.App.1987). Moreover, we note that it is clearly within the discretion of the trial judge to refuse questions he deems duplicitous or unnecessary. See *Boyd v. State*, 811 S.W.2d at 116 ("Duplicitous questions on voir dire may be limited to curb the prolixity of what can become the lengthiest part of a criminal proceeding.").

We hold that the trial judge did not abuse his discretion in disallowing appellant's request for additional time. Appellant had already been afforded additional time to question the venireperson, in excess of the thirty minutes to which both sides had previously agreed. In addition, the trial judge questioned the venireperson and concluded he was capable of following the law with respect voluntary intoxication. Based on the foregoing, we hold that the totality of the voir dire reveals that the trial judge did not err in refusing appellant's request.[14] Point of error number twenty-nine is overruled.

## VI.

In point of error number ten, appellant complains that the trial court allowed the State to strike venireperson Roseanne Sanchez for an impermissible, racially-motivated reason. The record reflects that the trial court took judicial notice that both appellant and Sanchez were members of

14. We note that appellant never clearly articulated what specific questions he desired to ask the venireperson. The trial judge, not being apprised of the exact contents of the proposed question, could have concluded that appellant's line of questioning was duplicitous of testimony already adduced. This is especially true since the trial judge had already stated for the record that it was his conclusion that the prospective

juror could follow the law regarding appellant's proposed area of inquiry. We further note that appellant's failure to propound a specific question may have constituted a waiver of error. See *Caldwell v. State*, 818 S.W.2d 790, 793–94 (Tex.Cr.App.1991). However, because we find no merit to appellant's substantive claim, we need not reach the question of whether his request was specific enough to preserve error.

the same minority group. The attorney for appellant informed the Court that the appellant desired Sanchez as a juror.

▉▉▉▉ The Court conducted a hearing, pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), at the conclusion of the individual voir dire of Sanchez.[15] The trial court found that appellant made a prima facia case and required the prosecutor to enunciate racially neutral reasons for the striking of Sanchez from the jury. The following reasons for the prosecutor's exercise of a peremptorily challenge against this venireperson were adduced during the prosecutor's testimony:

1. She expressed that she did not believe in the death penalty on her juror questionnaire;

2. That she was 25–years–old, unmarried, with no children (indicating a lack of ties to the community and less life experience);

3. She or someone she knew had consulted with a psychiatrist;

4. She had studied psychology in college;

5. Her brother had had trouble with law enforcement;

6. She had done volunteer work for two organizations (indicating she would be "kind-hearted and maybe would want to help try to save somebody"); and

7. She had answered that she would want an 89% probability of future dangerousness before answering "yes" to the second special issue.

The prosecutor testified that his decision to strike Sanchez was based on the totality of the above-discussed reasons, not any one particular answer. The prosecutor also conceded that he had not explored with the venireperson some of his reasons for striking her; however, it is clear from the record that the prosecutor had insufficient time during his voir dire to discuss at length all the concerns he had about the venireperson.

At the conclusion of the *Batson* hearing, the trial judge ruled that the State had supplied race neutral reasons for its peremptory strike and overruled appellant's objections.[16] In so doing, the judge implicitly found that appellant failed to rebut the

15. To be entitled to a *Batson* hearing, a defendant must present a prima facie case of purposeful racial discrimination by the State in the exercise of its peremptory strikes. See *Tompkins v. State*, 774 S.W.2d 195 (Tex.Cr.App.1987). That appellant made such a prima facie case is not in dispute. Once such a prima facie case has been established, the burden of proof to provide a race-neutral explanation for the exercise of a peremptory strike shifts to the State. See *Salazar v. State*, 795 S.W.2d 187 (Tex.Cr. App.1990). If the State supplies race neutral reasons for its peremptory challenge, the defendant then bears the burden of rebutting the explanation proffered by the State. See *Williams v. State*, 804 S.W.2d 95 (Tex.Cr.App. 1991).

16. The trial judge's specific ruling is set forth below:

[BY THE COURT]: The Court makes the following ruling: Based upon the reasons given by Mr. Beach [the prosecutor], based upon the State's Exhibit Number A [the juror's questionnaire and] the answers contained therein, the highlighted portions highlighted by Mr. Beach over a week ago, based upon my observation of the demeanor of the juror here in court and the answers given to questions propounded by both sides, based upon the totality of these circumstances, the Court finds that

the State has provided neutral explanations for exercising the peremptory challenge on this juror.

I find that this was not done for racially discriminatory purposes, and therefore the defense motion must be denied.

[BY DEFENSE COUNSEL]: May I ask the Court, since the Court was the first to mention the juror's demeanor in court, what you're talking about there? The State did not say anything about her demeanor.

[BY THE COURT]: She was equivocal. I mean, what I'm saying, Mr. Beach indicated [on cross-examination] that he wasn't sure that she was fabricating, but he did indicate, I have forgotten now what the words were you used, but it caught my attention that it did appear upon equivocation that she answered the questionnaire in one fashion, and I believe in his words, when she got on the hot seat, in other words, when she got here in court being questioned by the lawyers, she gave answers that were different. That's what I'm referring to.

All I'm saying is that based on the totality of the circumstances and not based upon any one factor he gave alone, but from all the circumstances, I'm not prepared to say and do not say and I don't even believe that he exercised his strike based upon race, but I believe he did it for the reasons he stated.

race neutral reasons provided by the prosecutor.

■ In passing upon the *Batson* error claimed here, we review the evidence adduced at the *Batson* hearing in the light most favorable to the trial court's ruling. *Williams v. State*, 804 S.W.2d 95 (Tex.Cr. App.1991). We will not overturn a trial judge's finding that the State exercised its strikes in a race neutral manner unless such ruling is clearly erroneous. *Whitsey v. State*, 796 S.W.2d 707, 720–23 (Tex.Cr. App.1989) (op. on reh'g).

In his brief, appellant relies heavily on the fact that other venirepersons whom the State found acceptable possessed the same characteristics that the prosecutor alleged caused him to excuse venireperson Sanchez. The prosecutor conceded this much during his cross-examination by defense counsel. However, the prosecutor stated repeatedly that it was the combination of a number of questionable aspects of this venireperson which led him to strike her.[17] The trial judge found this explanation credible and so do we.

■ "Disparate treatment," as such, cannot automatically be imputed in every situation where one of the State's reasons for striking a venireperson would technically apply to another venireperson whom the State found acceptable. See *United States v. Lewis*, 837 F.2d 415 (9th Cir.1987); *McHenry v. State*, 823 S.W.2d 667 (Tex. App.—Dallas 1991). The decision to strike a particular venireperson is not susceptible to rigid quantification; rather, it is a fluid process, often hinging on the interaction of a number of variables and permutations. See *United States v. Lance*, 853 F.2d 1177 (5th Cir.1988). For example, it is unlikely that two venirepersons on one panel will possess the same objectionable attribute or character trait in precisely the same degree. Such qualitative distinctions may

cause a prosecutor to challenge one venireperson and not the other. See *United States v. Alston*, 895 F.2d 1362 (11th Cir. 1990); *Roy v. State*, 813 S.W.2d 532 (Tex. App.—Dallas 1991, pet. ref'd).

■ Thus, when the State has offered more than one plausible reason for striking a venireperson, it is proper to review these reasons in their entirety in order to assess whether the State's explanation was valid or merely pretextual. Where, as here, the State has offered numerous race neutral reasons for its challenge, we cannot say that the fact that there were other acceptable jurors possessing one or more of these objectionable attributes, is sufficient to establish disparate treatment.

■ As indicated above, we accord great deference to the trial judge who was present to assess the credibility of the prosecutor and his explanations. See *Salazar v. State*, 818 S.W.2d 405 (Tex.Cr.App.1991). Thus, although appellant may have presented evidence that undermines the prosecutor's explanation, we do not find this evidence so persuasive that the trial judge's ruling to the contrary was unreasonable. See *Lewis v. State*, 815 S.W.2d 560, 564 (Tex.Cr.App.1991). Based on the foregoing, we cannot conclude that the trial court's holding that the State's reasons for excusing Sanchez were race neutral was clearly erroneous. *Id.* Appellant's tenth point of error is overruled.

## VII.

■ In point of error number eleven, appellant asserts that the trial court erred in overruling his objection to the final argument of the State during the punishment phase of the trial. In particular, appellant complains of the following prosecutorial argument:

17. We have reviewed the reasons given by the prosecutor and find them amply supported by the relevant case law. See *Tennard v. State*, 802 S.W.2d 678 (Tex.Cr.App.1990); *United States v. Jackson*, 914 F.2d 1050 (8th Cir.1990); *United States v. Briscoe*, 896 F.2d 1476 (7th Cir.1990); see also, *Davis v. State*, 822 S.W.2d 207 (Tex. App.—Dallas 1991); *Henderson v. State*, 816

S.W.2d 845 (Tex.App.—Fort Worth 1991); *Hawkins v. State*, 793 S.W.2d 291, 295 (Tex.App.—Dallas 1990, pet. ref'd); *Prosper v. State*, 788 S.W.2d 625, 628 (Tex.App.—Houston [14th Dist.] 1990, pet. ref'd); *Tims v. State*, 779 S.W.2d 517, 519 (Tex.App.—Beaumont 1989, no pet.); *Munson v. State*, 774 S.W.2d 778 (Tex.App.—El Paso 1989, no pet.).

[BY THE PROSECUTOR]: But you know, we've got this man who comes into the courtroom and he tells you, swears to tell you the truth, and he tells you that he has been shooting up cocaine some 15 times. And I keep hearing that number just ringing in my ears, 15 times, 15 times—did you kind of get the feeling that sometime before this trial somebody sat down and said 'Cantu, I think we better decide about 15. We better tell our expert that you've been shooting up about 15 times', because the way I added up his testimony in front of this jury, he didn't ever come close to 15 times.

[BY DEFENSE COUNSEL]: Judge, I do object to Mr. Gandy's statements on following grounds: Number one, that it assumes facts not in evidence; number two, that is not a reasonable deduction from the testimony; and the third ground is that is attacking the defendant over the shoulders of his counsel.

THE COURT: Overruled.

Proper jury argument falls into four well-defined categories of discussion: (1) a summation of the evidence, (2) reasonable deductions from the evidence admitted for consideration by the jury, (3) a rejoinder to argument by opposing counsel, and (4) a plea for law enforcement. *Harris v. State,* 784 S.W.2d 5 (Tex.Cr.App.1989).

Appellant testified at trial in his own behalf. During this testimony, appellant stated that he thought he had shot up "[m]aybe 15 [times], a little over 15, maybe a little under 15. I'm not too sure. But it was over ten times that I had shot up all night." Although when read as a whole his testimony indicates that he had purchased enough cocaine to allow him to "shoot up" perhaps as many as fifteen times, appellant discussed only six or seven specific instances where he actually "shot up" the cocaine. During closing argument, appellant's counsel discussed at length the effects of appellant's drug use. At two points during his closing argument, defense counsel stated that appellant had testified "about where he is using 12 or maybe 15 injections of cocaine over this period of time."

The prosecutorial argument to which appellant objects can best be categorized as an inference drawn from evidence adduced at trial. Clearly, appellant's assertion that he "shot up" fifteen times is arguably in conflict with his testimony regarding the specific instances in which he injected cocaine. Counsel is generally afforded wide latitude in drawing inferences from the record, as long as such inferences are reasonable and offered in good faith. *Denison v. State,* 651 S.W.2d 754, 761–62 (Tex.Cr.App.1983). We cannot say that the trial court erred in overruling the prosecutor's remarks, since these remarks refer to specific instances of appellant's conflicting testimony, directed towards undermining the credibility of the appellant.

Moreover, even if we were to hold the State's jury argument improper, it is nonetheless harmless beyond a reasonable doubt. See *Pyles v. State,* 755 S.W.2d 98, 117 (Tex.Cr.App.1988). Nothing in this argument can be said to have contributed to the jury's assessment of punishment, as the jury had before it copious testimony concerning appellant's prior criminal history, expert testimony as to his future dangerousness, and the heinous facts of the crime itself. Appellant's eleventh point of error is overruled.

### VIII.

Appellant's point of error thirty asserts that the trial judge's failure to limit the definitions of "intentionally" and "knowingly" in the jury charge constituted reversible error. Specifically, appellant contends that because capital murder is a "result of conduct" offense, the jury should have been instructed in such a fashion that would have limited it to finding appellant guilty of capital murder only if it found beyond a reasonable doubt that appellant murdered the victim with the requisite intent to cause the victim's death. See *Turner v. State,* 805 S.W.2d 423, 430 (Tex. Cr.App.1991). Such a "result of conduct" offense is distinguishable from an offense in which the State bears the burden of proving only that a defendant possessed a "conscious objective" to engage in a forbid-

den course of conduct. See *Alvarado v. State*, 704 S.W.2d 36 (Tex.Cr.App.1985).

We agree with appellant's summation of the law. However, we disagree with his application of the law to the facts of this case, and we find the cases cited by appellant in support of his argument to be distinguishable. It is clear to us that the trial court's charge to the jury, when read as a whole, allowed for a finding of guilt only if the jury found beyond a reasonable doubt that appellant engaged in the actus reus of the crime with the specific intent to cause the victim's death.[18] See *Turner v. State*, supra. Appellant's thirtieth point of error is overruled.

### IX.

■ In points of error thirteen through eighteen, appellant asserts error in the trial court's failure to define the terms "deliberately," "criminal acts of violence," and "probability" in its charge to the jury. This Court has repeatedly held, however, that the trial judge's failure to define these terms in the jury charge does not constitute error. See, e.g., *Caldwell v. State*, 818 S.W.2d 790, 797–98 (Tex.Cr.App.1991); *DeLuna v. State*, 711 S.W.2d 44, 47 (Tex. Cr.App.1986); *Adams v. State*, 577 S.W.2d 717, 730 (Tex.Cr.App.1979); *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr.App.1977). We also note that a trial judge's refusal to define these terms poses no constitutional problems. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Points of error thirteen through eighteen are overruled.

### X.

■ In related points of error, appellant asserts that Article 37.071 of the Texas Code of Criminal Procedure is unconstitutional, both facially and as applied, because it fails to guide or to limit the jury in its consideration of unadjudicated extraneous offenses. The gist of appellant's argument is that Article 37.071 is constitutionally flawed because it does not specify how the jury should consider extraneous offenses in arriving at an answer to the special issues. In support of this proposition, appellant relies exclusively on *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), which held:

> [W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. It is clearly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner.

While we recognize the verity of the language cited by appellant, we find it inapposite to the case at bar. Article 37.071 provides exactly the kind of guidance in sentencing called for in *Gregg* and other opinions from the Supreme Court. See, e.g., *Furman v. Georgia*, 408 U.S. 238, 92

---

18. The relevant portions of the trial court's charge to the jury read as follows:

Before you would be warranted in convicting the defendant of capital murder, you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was engaged in the commission or attempted commission of the felony offense of aggravated sexual assault of [the victim], but also that during the commission of the aggravated sexual assault or attempted commission thereof, if any, the defendant hit the head of [the victim] against the concrete *with the intention of killing her*. Unless you find from the evidence beyond a reasonable doubt that the defendant, on said occasion, *specifically intended to kill* [the victim] when he hit her head against the concrete, if he did, you cannot convict him of the offense of capital murder. In determining the intent of

an individual you are instructed that evidence of intent, if any, may be inferred by acts done or words spoken.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 25th day of June, 1988, in Dallas County, Texas, the defendant, Domingo Cantu, Jr., *did intentionally cause the death* of [the victim], an individual, by hitting her head against concrete, and the defendant, Domingo Cantu, Jr., *intentionally did cause the death* of said [victim], if he did, while the said Domingo Cantu, Jr., was in the course of committing or attempting to commit the offense of aggravated sexual assault of [the victim], as that offense has been previously defined, then you shall find the defendant guilty of capital murder and so say by your verdict.
(Emphasis supplied).

S.Ct. 2726, 33 L.Ed.2d 346 (1972). Specifically, the article disallows the imposition of death unless the jury finds, beyond a reasonable doubt, sufficient evidence of deliberateness, future dangerousness, and, if applicable, provocation. By circumscribing the conditions under which an individual can be sentenced to death, Article 37.071 provides the precise narrowing function contemplated by the above-cited cases. Consequently, we reject appellant's contention that the admission of unadjudicated extraneous offenses at the punishment phase of his capital murder trial was violative of the federal constitution. See *Aranda v. State*, 736 S.W.2d 702, 708 (Tex.Cr. App.1987); *Nethery v. State*, 692 S.W.2d 686, 708 (Tex.Cr.App.1985); *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984). Appellant's points of error nineteen and twenty are overruled.

## XI.

■ In point of error number twenty-four, appellant argues that the entire system devised by the Texas Legislature for imposing the death sentence is unconstitutional for the reason that under such system, "... the decision whether to pursue the death penalty rests solely with the prosecutor." We disagree.

It is well-settled that the discretion afforded the State to seek the death penalty is not unconstitutional. See *Gregg v. Georgia* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (holding that prosecutorial discretion was not unconstitutional); see also *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Barefield v. State*, 784 S.W.2d 38 (Tex.Cr.App.1989); *Livingston v. State*, 542 S.W.2d 655, 662 (Tex.Cr. App.1976). As the State aptly points out in its brief:

> Some prosecutorial discretion is inherent in any murder case. Yet under Art. 37.-071 and § 19.03 [of the Penal Code] the class of murder cases for which a prosecutor may seek the death penalty have [sic] been narrowly defined and limited. Additionally, there must be sufficient evidence to support the special issues which the jury must answer in order for the

death penalty to be imposed. Thus, the availability of the death penalty is very limited.

We agree with the State's analysis. Point of error number twenty-four is overruled.

## XII.

■ In points of error twenty-one and twenty-two, appellant challenges Article 37.071 on two related grounds. In point number twenty-one, it is urged that the article is unconstitutional because it prohibits the trial court from informing the jury of the effect of its inability to come to an agreement on one of the special issues. Point twenty-two asserts that the judge erred by not giving to the jury instructions which would have informed it that its failure to answer a special issue would have the effect of mandating a life sentence.

In essence, appellant argues that the failure to specifically inform the jury of the consequences of its failure to answer a special issue misleads the jury. In his brief, appellant postulates:

> A scenario could easily develop under the Texas statute where a juror feels that a no answer is appropriate but doesn't think their individual vote can determine the outcome of the case. Such a situation is unconstitutional because it fails to allow the juror to know the true effects of his actions.

In support of his position, appellant relies solely on *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

We find that case distinguishable from the instant case. In *Caldwell*, the Supreme Court held that it was constitutionally impermissible for a prosecutor to inform a capital jury that their decision was not final, as the defendant's case would be automatically reviewed by the state supreme court. The basis of the Supreme Court's opinion was that the prosecutorial remarks created the misleading impression that appellate review—and not the jury's verdict—would provide the ultimate determination of the appropriateness of the death penalty. As such, the prosecutor's argument undermined the importance of the jury's deliberations in a capital case.

Thus, the Supreme Court held that there was an unacceptable risk that "the death penalty may [have been] meted out arbitrarily or capriciously."

▮ The case at bar, however, does not involve the communication of misinformation to the jury by the State's attorney. Nor does the trial judge's instruction to the jury create a misleading impression regarding the consequences of their deliberations. Rather, the instruction plainly provided that the jury could not answer "yes" to the special issues except by unanimous consent.[19] Such an instruction focuses the jury on the relevant factors to be considered in determining an individual's deathworthiness and forecloses the possibility that irrelevant considerations will be introduced into the deliberation process. This procedure, designed to remove vagary and capriciousness from the capital sentencing process, is consistent with the Supreme Court's concerns for a particularized determination of an individual's deathworthiness according to specified criteria. See *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); see also *Gregg,* supra; *Furman* supra. Points of error twenty-one and twenty-two are overruled.

### XIII.

▮ In points of error one through eight and point of error twelve, appellant raises various arguments relating to the trial judge's charge to jury on mitigating evidence. As all of these points of error implicate the United States Supreme Court's decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), they will be addressed together.

At the punishment phase of appellant's trial various mitigating evidence was offered by appellant as follows:

1. Evidence of appellant's age as a mitigating factor (the record reflects he was twenty at the time of the offense);

2. Evidence that appellant's father was an alcoholic;

3. Evidence of appellant's voluntary intoxication at the time of the offense; and

4. Evidence of appellant's long-term abuse of alcohol and drug abuse; particularly the fact that appellant had been sniffing paint and other inhalants since age thirteen or fourteen, which had caused his personality to alter drastically.

After careful review of the record, as well as due consideration of appellant's arguments, we conclude that previous decisions from this Court make clear that none of the evidence presented at trial warranted a special instruction on mitigation, as contemplated in *Penry.*

In a number of recent decisions, this Court has held that no *Penry* instruction was required when the only evidence offered in mitigation was of appellant's youthful age and that appellant experienced childhood difficulties not rising to the level of the severe abuse seen in *Penry.* See, e.g., *Lackey v. State,* 819 S.W.2d 111 (Tex.Cr.App.1989) (op. on reh'g); *Jackson v. State,* 819 S.W.2d 142 (Tex.Cr.App. 1990); *Trevino v. State,* 815 S.W.2d 592 (Tex.Cr.App.1991). A majority of this Court has also held that evidence of an appellant's voluntary intoxication at the time of the offense does not necessitate a special *Penry* instruction. *Goss v. State,* 826 S.W.2d 162 (Tex.Cr.App.1992) (plurality op.). Having concluded that the evidence offered by appellant in mitigation of his crime was not of such caliber as to warrant a special jury instruction under *Penry,* we overrule points of error one through eight and twelve.

---

**19.** The trial judge's charge to the jury read, in relevant part:

> If there is any Special Issue on which the vote of the jurors is not unanimously "yes" or not at least ten (10) in favor of an answer of "no," then there shall be no answer for that Special Issue and the Foreman should not sign his or her name to any answer form for that Special Issue.

This charge satisfactorily complied with Article 37.071(d), which provides:

> The court shall charge the jury that:
> (1) it may not answer any issue "yes" unless it agrees unanimously; and
> (2) it may not answer any issue "no" unless 10 or more jurors agree.

694

The judgment of the trial court is AF-FIRMED.

CLINTON, J., concurs in the result.