TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00531-CR






Gabriel Sandoval, Appellant



v.



The State of Texas, Appellee






FROM THE COUNTY COURT AT LAW NO. 1 OF HAYS COUNTY


NO. 53,077, HONORABLE HOWARD S. WARNER II, JUDGE PRESIDING







 Appellant Gabriel Sandoval appeals the trial court's refusal to suppress the results
of the breath test he took after he was arrested for driving while intoxicated (DWI). See Tex.
Penal Code Ann. § 49.04(a) (West Supp. 2000). We will affirm.

 On July 26, 1998, Officer Randy Harkey of the Hays County Sheriff's Department
was driving north on Interstate 35, checking drivers' speed with radar. Harkey estimated he was
moving at sixty miles per hour, but admitted he may have been driving as slowly as fifty-seven
miles per hour in the sixty-five mile per hour speed zone. A car came up behind Harkey's patrol
car very rapidly. When Harkey hit his rear flashers to alert the other driver to his presence, the
driver locked his brakes, forcing the front of the car down and squealing the tires. Harkey moved
over to let the car pass and then pulled back behind the car and turned on his lights. Without
signaling, the driver crossed three lanes of traffic to pull his car over on the shoulder.


 Harkey asked the driver, appellant, to step out and walk to the back of the car. 
Harkey viewed appellant's driver's license and asked why appellant had been driving so fast. 
Appellant said he had not been paying attention. Harkey smelled a strong odor of alcohol as he
spoke to appellant and saw an open, half-full beer container in the passenger compartment and
three unopened cans of beer in the trunk. Harkey asked if appellant had been drinking, and
appellant replied he had had a few beers. Appellant refused to take a field sobriety test, claiming
he had a bad hip. Appellant also refused to recite the alphabet. Harkey performed a horizontal
gaze nystagmus test, which appellant failed. Appellant's speech was slurred and his eyes were
bloodshot. 

 Harkey asked appellant if he would take an intoxilyzer test, and appellant asked
"what would happen if he passed the test." Harkey testified that he told appellant that if he failed
the test he would be charged with DWI, but if he passed, Harkey would call one of appellant's
family members to pick him up. Appellant then agreed to take the test. He was transported to
the Hays County Jail, where he was videotaped being given another opportunity to take field
sobriety tests and being read his rights. Appellant indicated he understood his rights and refused
to take the field sobriety tests. Appellant was asked twenty-one questions, some of which he
answered and some of which he refused to answer. Harkey remembered that appellant refused
to say what he had been drinking, except to say "water." Harkey again asked appellant if he
would take an intoxilyzer test, and appellant agreed. Appellant signed the consent form and took
and failed the intoxilyzer test. Harkey testified he did not coerce or threaten appellant.

 Appellant filed a motion to suppress the intoxilyzer results based on Erdman v.
State, 861 S.W.2d 890 (Tex. Crim. App. 1993). Appellant argued that Harkey's statement that
appellant could go home with a family member if he passed the test was a "great, great, great
incentive, especially late at night, to coerce somebody into taking [an intoxilyzer] test." The State
responded that Harkey had not coerced appellant into taking the test. The trial court denied
appellant's motion to suppress, and appellant entered a plea of nolo contendere, reserving the right
to appeal the denial of his motion to suppress. The trial court sentenced him to sixty days in jail
with work release and a $500 fine and stayed the start of his jail time pending this appeal.

 In one issue on appeal, appellant argues the trial court erred in refusing to suppress
his intoxilyzer results because his consent was coerced by Harkey's statement that if appellant
passed he would be released to the custody of his family. We disagree.

 The admission or exclusion of evidence is within the trial court's discretion. See
Jackson v. State, 575 S.W.2d 567, 570 (Tex. Crim. App. 1979); Ewerokeh v. State, 835 S.W.2d
796, 798 (Tex. App.--Austin 1992, pet. ref'd). We will not reverse a trial court's ruling absent
a clear showing of an abuse of discretion, defined as a decision "so clearly wrong as to lie outside
that zone within which reasonable persons might disagree." Cantu v. State, 842 S.W.2d 667, 682
(Tex. Crim. App. 1992).

 The implied consent statute provides that a person arrested for an offense alleged
to have arisen out of acts committed while operating a motor vehicle while intoxicated is deemed
to have consented to the taking of samples for a breath or blood test. See Tex. Transp. Code
Ann. § 724.011 (West. 1999). Before an officer may request a breath specimen from a person
arrested for DWI, the officer must inform the person of two consequences of refusing to submit
a specimen: (1) the refusal may be admissible in a subsequent prosecution; and (2) the person's
driver's license will be automatically suspended. See id. § 724.015(1)-(2) (West 1999). These
warnings emphasize the importance of ensuring that the consent is given "freely and with a correct
understanding of the actual statutory consequences of refusal." Erdman, 861 S.W.2d at 893
(discussing former article 6701l-5, § 2 of Texas Revised Civil Statutes, since repealed and
re-codified as § 724.015 of Transportation Code). A person's consent to a breath test is voluntary
only if it is not the result of physical or psychological pressures. See id. If the officer requesting
a breath sample misstates the law and includes extra-statutory consequences of a refusal to submit
to the breath test, the consent may be considered to have been involuntarily given. See id. at 893-94; Texas Dep't of Public Safety v. Rolfe, 986 S.W.2d 823, 827 (Tex. App.--Austin 1999, no
pet.); State v. Sells, 798 S.W.2d 865, 867 (Tex. App.--Austin 1990, no pet.).

 Case law generally focuses only on extra-statutory warnings of consequences of
refusing a breath test. See, e.g., Erdman, 861 S.W.2d at 893-94; Rolfe, 986 S.W.2d at 826; see
also Ewerokeh, 835 S.W.2d at 796; Sells, 798 S.W.2d at 866 (pre-Erdman cases also considering
extra-statutory warnings of refusal to take test). It is true, as appellant states, that Erdman was
told of the consequences of passing and failing the intoxilyzer test. See Erdman, 861 S.W.2d at
891. He was also told, however, of the consequences of refusing the test. See id. The court of
criminal appeals focused its analysis exclusively on the extra-statutory warnings concerning the
consequences of refusing the test. See id. at 893-94. The court stated:


[A] person [arrested for DWI] must be warned that two specific consequences--only
two--will definitely and directly result from a refusal to submit to a breath test . .
. . The Legislature has provided that only these two sanctions will directly result
from a refusal to submit to a breath test. . . . If law enforcement officials were
permitted to "warn" D.W.I. suspects--even correctly--that a refusal to submit would
result in consequences not contemplated by [the implied consent statute], then
suspects could easily be coerced into submission, and the protection afforded by
this statutory section would be undermined. 



Id. at 893 (emphasis added) (citations omitted). 

 The court did not hold Erdman's consent was coerced by the warnings about the
consequences of taking and passing or failing the test. The court stated:


[Erdman] consented to the intoxilyzer test only after the trooper gave him
warnings, both contemplated and not contemplated by [the implied consent statute],
concerning the consequences of refusal. The non-statutory information conveyed
to [Erdman] (that he would be jailed and charged with D.W.I.) was of the type that
would normally result in considerable psychological pressure upon a D.W.I.
suspect to consent to the taking of a breath sample. Given the complete absence
of any record evidence showing that this non-statutory information given to
[Erdman] had no bearing on his decision to consent, no rational factfinder could
conclude that the State carried its burden of showing that [Erdman's] consent was
voluntary.



Id. at 893-94. The court was careful to say it held "only that law enforcement officials must take
care to warn D.W.I. suspects correctly about the actual, direct, statutory consequences of
refusal." Id. at 894.

 The Erdman court indicated that the warning of additional, non-statutory
consequences of refusal was inherently coercive and would give rise to the inference that the
consent was coerced, requiring the State to present evidence that the consent was in fact voluntary. 
See id. at 894. In other words, because the warnings were conclusively coercive and the State
presented no evidence showing the consent was voluntary, whether the defendant was actually
coerced was not a fact question at the suppression hearing. See id. (no rational fact finder could
conclude consent was voluntary). However, it is not enough simply to show extra-statutory
warnings of any kind were given; in the absence of an extra-statutory warning that is inherently
and necessarily coercive, the defendant must also show "a causal connection between [the]
improper warning and the decision to submit to a breath test." Rolfe, 986 S.W.2d at 827. 

 We recognize an argument can be made that appellant may have been influenced
to some degree by learning he could go home if he passed the test, but we do not believe those
warnings were as coercive as the statements on which Erdman was based. The statements in the
present case do not lead to a conclusion of coercion that would require the State to present
rebutting evidence. Instead, we believe the burden remained on appellant to show that the extra-statutory warnings actually coerced his consent. See id. (evidence indicated Rolfe consented
before receiving alleged improper warnings; she did not testify at suppression hearing or present
any other evidence that improper warnings coerced consent). 

 The only case we have found concerning this very specific issue--the validity of
consent given after hearing consequences of passing and failing a breath test--is State v. Serrano,
894 S.W.2d 74 (Tex. App.--Houston [14th Dist.] 1995, no pet.). Serrano was stopped for erratic
driving, arrested for DWI, and asked if he would consent to taking an intoxilyzer test. See
Serrano, 894 S.W.2d at 75. He was told "if he passed the test he would be free to go but if he
failed the test he [would] be put in jail for D.W.I.," and thereafter consented to the test. Id. at
75. Serrano argued that his consent was coerced and the trial court granted his motion for new
trial. See id. The State appealed, arguing the trial court had abused its discretion in granting the
new trial. See id. The appellate court disagreed, holding that the trial court's decision to grant
a new trial "was within the zone within which reasonable persons might disagree." (1) Id. at 76.

 In the present case, we believe the trial court's decision not to suppress appellant's
test results was likewise within the zone of reasonable disagreement. The statements appellant
heard about what would happen if he passed or failed the breath test were not of the same coercive
nature as those in Erdman, and appellant did not present additional evidence to show a causal link
between those statements and his consent to the test. Accordingly, the trial court did not abuse
its discretion in refusing to suppress appellant's intoxilyzer results. 

 We affirm the trial court's judgment.



 
 

 J. Woodfin Jones, Justice

Before Justices Jones, Yeakel and Patterson

Affirmed

Filed: May 18, 2000

Publish
1. The Serrano court used language from Erdman but did not appear to consider the difference
between telling a suspect the consequences of refusing to take a breath test as distinguished from
the consequences of taking and passing or failing a test. See Serrano, 894 S.W.2d at 75. Serrano
paraphrases Erdman and states that "[w]arning D.W.I. suspects--even factually correctly--of
consequences not contemplated in [the implied consent statute] could easily coerce suspects into
submission to take the intoxilyzer test, and the protection afforded by the statute would be
undermined." Id. However, the paraphrased statement in Erdman was directed at the danger of
coercion arising out of refusal consequences, not pass/fail consequences. See Erdman, 861
S.W.2d at 893. To the extent Serrano actually stands for the proposition that merely telling a
DWI suspect of the consequences of passing or failing a breath test is necessarily coercive, we
disagree with that proposition and decline to follow Serrano. 



uld
conclude consent was voluntary). However, it is not enough simply to show extra-statutory
warnings of any kind were given; in the absence of an extra-statutory warning that is inherently
and necessarily coercive, the defendant must also show "a causal connection between [the]
improper warning and the decision to submit to a breath test." Rolfe, 986 S.W.2d at 827. 

 We recognize an argument can be made that appellant may have been influenced
to some degree by learning he could go home if he passed the test, but we do not believe those
warnings were as coercive as the statements on which Erdman was based. The statements in the
present case do not lead to a conclusion of coercion that would require the State to present
rebutting evidence. Instead, we believe the burden remained on appellant to show that the extra-statutory warnings actually coerced his consent. See id. (evidence indicated Rolfe consented
before receiving alleged improper warnings; she did not testify at suppression hearing or present
any other evidence that improper warnings coerced consent). 

 The only case we have found concerning this very specific issue--the validity of
consent given after hearing consequences of passing and failing a breath test--is State v. Serrano,
894 S.W.2d 74 (Tex. App.--Houston [14th Dist.] 1995, no pet.). Serrano was stopped for erratic
driving, arrested for DWI, and asked if he would consent to taking an intoxilyzer test. See
Serrano, 894 S.W.2d at 75. He was told "if he passed the test he would be free to go but if he
failed the test he [would] be put in jail for D.W.I.," and thereafter consented to the test. Id. at
75. Serrano argued that his consent was coerced and the trial court granted his motion for new
trial. See id. The State appealed, arguing the trial court had abused its discretion in granting the
new trial. See id. The appellate court disagreed, holding that the trial court's decision to grant
a new trial "was within the zone within which reasonable persons might disagree." (1) Id. at 76.

 In the present case, we believe the trial court's decision not to suppress appellant's
test results was likewise within the zone of reasonable disagreement. The statements appellant
heard about what would happen if he passed or failed the breath test were not of the same coercive
nature as those in Erdman, and appellant did not present additional evidence to show a causal link
between those statements and his consent to the test. Accordingly, the trial court did not abuse
its discretion in refusing to suppress appellant's intoxilyzer results. 

 We affirm the trial court's judgment.