

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-21-00085-CR

PATRICK BRANDON, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 47754-A

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

After a jury found Patrick Brandon, Jr., guilty of aggravated robbery, he was sentenced to sixty years' confinement in prison and ordered to pay a fine and court costs. In the same proceeding, Brandon was also convicted of possession of a controlled substance with the intent to deliver, possession of a controlled substance, and unlawful possession of a firearm by a felon.[1] As a result of those convictions, Brandon was sentenced to prison for twenty years, five years, and ten years, respectively. The trial court ordered the four sentences to run concurrently.

On appeal, Brandon maintains that (1) the evidence was insufficient to prove beyond a reasonable doubt that he used or exhibited a firearm during the commission of the robbery, (2) the State violated his equal protection rights by exercising peremptory strikes to remove two of the three African American panel members within the strike zone, (3) the trial court erred when it assessed duplicative court costs, (4) the trial court erred by cumulating the fines assessed in multiple counts, and (5) the trial court erred when it assessed time payment fees.

For the reasons below, we modify the trial court's judgment and the bill of costs by deleting the court costs and fees[2] and by changing the notation of Brandon's plea to the State's enhancement allegation from "not true" to "true." As modified, we affirm the trial court's judgment.

---

[1]Brandon appeals those convictions in our cause number 06-21-00086-CR.

[2]A $15.00 time payment fee was included in the court costs.

## I.     Evidence

On May 1, 2018, Ashlyn Varnell was going about her job duties as a teller at Regions Bank in Longview.  Around 1:00 o'clock in the afternoon, an individual approached her window and slid a note to her.  The note said,

> Do not hit any panic buttons or alarms.  I have a gun.  Do not make eye contact with anyone.  Give me all the money out this teller, no dye packs or tracking devices.  Once you give me all the money, turn around and go to a restroom, slide me the note back, do not press any buttons or alert anyone or police.

Varnell said, "[M]y immediate reaction was we're being robbed, so get all the money that was in my teller drawer and hand it over."  Because the note said, "I have a gun," Varnell believed that she had to comply with the note's instructions, or she would have been shot.  Varnell slid the note back to the robber, looked up, and then immediately began getting what she believed to be around $11,000.00 out of the vault.  After giving him the money, he "turned around and walked out."   Varnell said that the money was made up of multiple banded stacks of cash in denominations of hundreds, twenties, tens, fives, and ones.

After the initial commotion subsided, Varnell began having a panic attack.  She said, "I couldn't get it out, they had no clue what was actually happening until I just screamed the word, you know, robbery; and so, yes, I did have an emotional outbreak."  When the other employees realized that the bank had just been robbed, they began locking the bank's doors.  Varnell said that she felt "no relief until [she] left that bank later on that day."

According to Varnell, during the robbery, she could only see the upper half of the robber's torso from behind the counter.  She said that the individual was an African American

3

male in his mid to late twenties and that he had some facial hair, but not a full beard. He was also wearing a red or black hat. She did not recall seeing any distinctive markings on him.

When Varnell gave her written statement to law enforcement after the robbery, she wrote that the robber's note said, "I will shoot you." Although her written statement differed from the actual note, Varnell said that she interpreted the robber's assertion that "[he had] a gun" to mean that "if [she] didn't follow those demands that [the] individual robbing the bank [would] shoot [her]." According to Varnell, she had previously received training related to dye packs and bait money,[3] and there had been dye packs in her drawer that day. But, because she felt threatened, she did not use them. Varnell left the bank around 5:30 p.m., went home, immediately packed a bag, and went to stay with her uncle for a week. She did not return to work until a week after the robbery, and she left her job at the bank about three months later. Varnell said that, when she did return to work, she was "[a]bsolutely" anxious and, at nighttime, she had had trouble sleeping.

On cross-examination, Varnell conceded that she neither saw a gun during the robbery nor saw the robber make any movements as if he had a gun. But she also explained that, from where she was, she could not see below the middle of his chest. According to Varnell, the robber did not act "necessarily out of the ordinary," and he did not raise his voice or use a menacing tone when speaking to her.

On the day of the robbery, Amber Campbell had been working at the bank as a financial relationship consultant. She had just returned from lunch when the robbery occurred. Campbell explained that the teller's windows were right across from her office, so she had a "straight view

---

[3]During training, Varnell was instructed that, if there could be a violent outcome, bodily injury, or loss of life, she should not use a dye pack or marked money.

4

of the tellers." According to Campbell, she noticed an individual in front of Varnell's station, with one or two other customers in front of the robber. Campbell said that she made eye contact with him two or three times. But when he reached Varnell's window, Campbell could not see what was happening. She did, however, see the individual "walk out, and he [was] holding his shirt." Campbell said that, after he left the bank, Varnell "kind of collapse[d]" and then Campbell saw Varnell run into the back of the bank.[4] Realizing what had just happened, Campbell went to lock the bank's door.

Campbell believed the robber's shirt was short-sleeved, white, gray, or a light color, with red writing on it. She was certain he was wearing a red hat and red jeans. Campbell said that his shoes may have had red writing on them. After identifying Brandon in the courtroom, Campbell said that there was "[n]o doubt in [her] mind" that he was the individual who had robbed the bank. Campbell conceded, however, that she did not identify the robber immediately after the robbery. When asked how she could identify him in the courtroom, but was unable to identify him the day of the robbery, Campbell explained that the police may have asked her a "different question[,]" or "[m]aybe [she] was still a little taken back by it." Yet, she repeated that she was 100 percent sure that Brandon had been the robber. Campbell said that the robbery took place in about two or three minutes—"give or take"—and that she did not see a weapon during the incident. According to Campbell, the robbery was a significant event in her life, and the incident had caused her to worry about going to work in the future.

---

[4]Campbell said, "[Varnell] was very emotional, so she just hit the ground. She was crying, she was -- I think she was having a panic attack, kind of hyperventilating."

Kathryn A. Lumley, who was employed by Regions Bank in corporate security, testified that she was familiar with the bank's internal and external security.[5] On the day of the robbery, the bank's security cameras had been in working order. When Lumley watched the recordings and looked at the still shots taken from them, she did not see the robber display a weapon. Lumley said that, after the robbery, she spoke to Varnell, who told her that she did not give the robber a dye pack or a tracker because if she had, she would have been shot.

Jeffrey Bowles, who had been visiting Regions Bank a little after 1:00 p.m., testified that he had seen an individual walk out of the bank wearing a red hat and red pants. Bowles stated that the individual proceeded to get into a "Toyota like vehicle, like a four-door sedan, light in color." He then clarified that the vehicle had been silver. According to Bowles, the person had been "carrying something because when he came out of the exit -- the doors out of Regions he stuffed something up underneath his coat -- up underneath his arm." He said he did not see any type of firearm. Bowles believed that the individual entered the driver's side door of the vehicle and then headed south. Bowles stated that his car had been parked in the parking place adjacent to the silver car. According to Bowles, the person getting into the car was a younger African American man who had been wearing a brightly colored hat.

On May 3, 2018, around 2:00 a.m., patrol officer Danny Isonhood was sitting in his patrol vehicle "observing a specific area[,]" which was known for its high crime rate. Isonhood observed a silver car driving northbound without stopping at a stop sign. Isonhood began

---

[5]Lumley had worked for the Federal Bureau of Investigation for twenty-two years. During that time, she investigated white-collar crimes and had experience in investigating bank robberies.

pursuing the vehicle at a high rate of speed, and the driver, who was subsequently identified as Brandon, eventually stopped.

Heath DeGarmo, the backup officer at the scene, testified that, after he arrived, he placed Brandon in handcuffs and proceeded to search his car, finding narcotics, marihuana and a "clear baggie that had a white powdery substance that [he] believed to be powder cocaine." In a subsequent search of the vehicle, officers found a large amount of money in the console, some of which was banded, but "[t]here was also loose money throughout." According to DeGarmo, a loaded Taurus 9-millimeter pistol was also found underneath the driver's seat.

## II. Sufficiency of the Evidence

Brandon contends that the evidence was insufficient to support his conviction of aggravated robbery because the State did not prove that he used or exhibited a deadly weapon during the commission of the robbery.

### A. Standard of Review

In evaluating legal sufficiency in this case, we must consider all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found, beyond a reasonable doubt, that Brandon was guilty of aggravated robbery. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 433 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 317 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in

7

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). We afford almost total deference to a jury's credibility determinations. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). An appellate court may not re-evaluate the weight and the credibility of the evidence or substitute its judgment for that of the fact-finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Further, circumstantial evidence is as probative as direct evidence, and it can be sufficient alone in establishing guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "[I]n analyzing legal sufficiency, we 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (citing *Hooper*, 214 S.W.3d at 16–17). "Evidence is legally insufficient when the 'only proper verdict' is acquittal." *Nelson v. State*, 405 S.W.3d 113, 122 (Tex. App—Houston [1st Dist.] 2013, pet. ref'd) (quoting *Tibbs v. Florida*, 457 U.S. 31, 41–42 (1982)).

Finally, "[l]egal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Malik v. Sate*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

8

**B.      Discussion**

In its indictment, the State alleged that Brandon,

> on or about the 1st day of May, 2018, . . . while in the course of committing theft of property and with the intent to obtain or maintain control of the property, intentionally or knowingly threaten[ed] or place[d] Ashlyn Varnell in fear of imminent bodily injury or death, and [he] did then and there use or exhibit a deadly weapon; to-wit:  a firearm during the commission of said robbery.

The indictment alleged the elements of aggravated robbery[6] and specified that the deadly weapon used or exhibited was a firearm.  Because the State increased its burden of proof by specifying a firearm rather than just alleging use or exhibition of a deadly weapon, the State was bound to prove that a firearm was used or exhibited during the robbery.  *Curry v. State*, 30 S.W.3d 394, 403 (Tex. Crim. App. 2000).  A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."  TEX. PENAL CODE ANN. § 1.07(a)(17)(B).  A firearm is "any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use."  TEX. PENAL CODE ANN. § 46.01(3) (Supp.).

In an effort to establish that the evidence was insufficient to prove that he used or exhibited a deadly weapon during the commission of the robbery, Brandon relies on the fact that no one saw him in possession of a weapon during the robbery.  In support of his position, Brandon directs us to *Flores v. State*, 620 S.W.3d 154 (Tex. Crim. App. 2021).  In that case, Flores robbed a convenience store while exhibiting "a cordless electric drill wrapped in two plastic bags."  *Id.* at 156.  Flores pointed the drill as if it were a gun, but he never attempted to strike the cashier nor did he threaten to do so.  *Id.*  The Texas Court of Criminal Appeals stated,

---

[6]*See* TEX. PENAL CODE ANN. § 29.03.

9

> While the State was of course not required to present evidence establishing that Appellant actually intended to use the drill to cause serious bodily injury or death, it was at least required to present some minimal evidence that he intended a violent use of the drill—one that would be at least "*capable* of causing death or serious bodily injury."

*Id.* at 60 (citing TEX. PENAL CODE ANN. § 1.07(a)(17)(B)).

The issue in *Flores* was whether the drill was used in a manner that was capable of causing death or serious bodily injury. That is not the issue in this case. The weapon used in this case, a firearm, is considered a deadly weapon per se. TEX. PENAL CODE ANN. § 1.07(a)(17)(B). And, with few exceptions, a gun is capable of causing death or serious bodily injury. Here, we must determine whether Brandon actually "used" or "exhibited" a firearm during the commission of the robbery.

*Patterson v. State*, 769 S.W.2d 938 (Tex. Crim. App. 1989), is the seminal Texas case that discusses the meanings of "use" and "exhibit." In that case, the Texas Court of Criminal Appeals explained,

> Thus, "used . . . a deadly weapon" during the commission of the offense means that the deadly weapon was employed or utilized in order to achieve its purpose. . . . Therefore, the court of criminal appeals was correct when it stated that "'used . . . during the commission of a felony offense' refers certainly to the wielding of a firearm with effect, but it extends as well to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony." *Patterson v. State*, [723 S.W.2d 308, 315 (Tex. App.—Austin 1987), *aff'd and remanded by* 769 S.W.2d 938]. However, to "exhibit" a deadly weapon it need only be consciously displayed during the commission of the required felony offense. Thus, one can "use" a deadly weapon without exhibiting it, but it is doubtful one can exhibit a deadly weapon during the commission of a felony without using it.

*Id.* at 941. In *Herring v. State*, 202 S.W.3d 764 (Tex. Crim. App. 2006), the Texas Court of Criminal Appeals held that the evidence was sufficient to prove that the defendant had used or

10

exhibited a knife when he committed aggravated robbery. The evidence in that case showed that the defendant broke into the victim's home and, after a struggle, tied up the occupant of the home. The victim testified at trial, "He said he had a knife and I never [saw] the knife but I was pretty sure he had one." The Texas Court of Criminal Appeals found that the defendant's statement that he had a knife was an admission and, thus, "admissible as substantive evidence." *Id.* at 766. Consequently, the defendant's statements that he had a knife and would kill the victim supported a finding that Herring used or exhibited a deadly weapon during the commission of the robbery. *Id.*

Here, the evidence was insufficient to show that Brandon *exhibited* the weapon during the robbery. That said, the evidence was sufficient to show that Brandon *used* the weapon during the robbery. Brandon entered the bank for no other reason than to rob it. In an effort to produce the result he desired—stealing cash—Brandon handed Varnell a note that stated, in its second sentence, that he had a gun. The fact that Brandon did not orally tell Varnell that he was in possession of a gun makes little, if any, difference. Brandon clearly communicated that information to Varnell. In addition, not only did Brandon indicate in the note to Varnell that he had a gun, but he also ordered her to do a number of other things, such as give him "all the money," "go to a restroom," and "slide the note back to him." Likewise, in the note, Brandon ordered Varnell to refrain from doing several things, including, pushing buttons, making eye contact, and using dye packs or tracking devices. The jury was well within its discretion to infer, from the contents of the note, that, if Varnell did not comply with Brandon's orders, Brandon had in his possession a firearm with which he would force Varnell to comply or suffer the

11

consequences. Certainly, Brandon's written statement that he was in possession of the gun directly facilitated the bank robbery.

We, therefore, overrule Brandon's first point of error.

**III.     The State Did Not Violate Brandon's Equal Protection Rights**

In his third point of error, Brandon contends that the State violated his equal protection rights when it exercised peremptory strikes to remove two of the three African American jury panel members within the strike zone.

**A.     Applicable Law and Standard of Review**

The State's purposeful use of peremptory strikes in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). The United States Supreme Court has outlined a three-step process for evaluating claims that the State has exercised peremptory challenges in a manner violating the Equal Protection Clause. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson*, 47 U.S. at 96–98. The defendant must first make a prima facie showing that the State has exercised peremptory challenges on the basis of race. *Hernandez*, 500 U.S. at 358. Once that prima facie showing is accomplished, the burden shifts to the State to present a racially neutral reason for the challenged jury strikes. *Batson*, 476 U.S. at 97–98; *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012). Once the State's reason is proffered, the burden of persuasion shifts back, and the person raising the challenge must then convince the court that the reason given by the State was not race-neutral and was merely a pretext for concealing discrimination. *Batson*, U.S. at 98; *Nieto*, 365 S.W.3d at 676.

12

Unless it is clearly erroneous, the trial court's ruling on the issue of discriminatory intent must be sustained. *Hernandez*, 500 U.S. at 369. Because the trial court is in the best position to determine if the State's facially neutral explanation for a peremptory strike is genuine, a high degree of deference is given to the trial court's decision in this regard. *Nieto*, 365 S.W.3d at 676. In its evaluation, the trial court "must focus on the genuineness of the asserted non-racial motive, rather than the reasonableness." *Id.* (citing *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam)). To determine whether the trial court's ruling was clearly erroneous, we examine the record to determine whether the ruling leaves us with a "'definite and firm conviction that a mistake has been committed.'" *Guzman v. State*, 85 S.W.3d 242, 254 (Tex. Crim. App. 2002) (quoting *United States v. Fernandez*, 887 F.2d 564, 567 (5th Cir. 1989) (per curiam)). The trial court's decision is not clearly erroneous if it is "supported by the record, including the voir dire, the [State]'s explanation for [its] use of a peremptory challenge, the rebuttal by appellant[,] and impeaching evidence." *Camacho v. State*, 864 S.W.2d 524, 528 (Tex. Crim. App. 1993).

**B.      Discussion**

Brandon complains that the State used two of its peremptory strikes to prevent Phillip Williams and Latanya Sammons, both African American jury panel members, from sitting on the jury. In Brandon's opinion, the trial court clearly erred when it accepted the State's proffered race-neutral reasons. According to Brandon, the State's race-neutral reasons were either unsupported by the record or shared by other non-African American jurors against whom the State did not exercise peremptory strikes.

13

The State first notes that Brandon presented an exceptionally weak prima facie case of racial discrimination in regard to all of his *Batson* challenges.[7] Yet, when a responding party has offered a race-neutral reason for a peremptory challenge and the trial court has ruled on the ultimate issue of purposeful discrimination, the preliminary question of whether the objecting party made a prima facie case becomes moot. *Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003); *Malone v. State*, 919 S.W.2d 410, 412 (Tex. Crim. App. 1996). Here, because the State offered race-neutral reasons for its strikes in regard to Williams and Sammons and the trial court ruled in its favor, the prima facie case inquiry was mooted. As a result, we move on to whether the State's expressed reasons were in fact race-neutral.

### 1.     Phillip Williams

After the parties made their strikes, the trial court announced the names of the panel members who would be seated as jurors and asked the parties whether they had any questions or objections. Brandon made a *Baston* challenge in regard to Williams. The State's initial response was that it struck Williams because it had issues with his answers concerning the meaning of "beyond all doubt" as opposed to "beyond a reasonable doubt."

During voir dire, the following conversation occurred between the State and Williams:

> [STATE]:  If you know something beyond all doubt, how can you be --
> how can that be?

---

[7]A defendant's initial burden of establishing a prima facie case is not difficult. *Dewberry v. State*, 776 S.W.2d 589 (Tex. Crim. App. 1989). To make a prima facie case, a defendant needs to show (1) that he is a member of a cognizable racial group, (2) that the State exercised peremptory challenges to remove members of the defendant's race from the jury panel, and (3) that the facts and any other relevant circumstances raise an inference that the State used the peremptory challenges to exclude panel members based on their race. *Salazar v. State*, 818 S.W.2d 405, 407 (Tex. Crim. App. 1991).

14

VENIREPERSON WILLIAMS:  You have 100 percent proof, you -- if it's 100 percent all doubt I just -- I know that's probably -- there's no doubt. Everything I need to know is right there.

[STATE]:  Okay.

VENIREPERSON WILLIAMS:  There's no question.

[STATE]:  All right.  Fair to say you'd have to be there and see it?

VENIREPERSON WILLIAMS:  That I would have to be there to see it?

[STATE]:  Yes.

VENIREPERSON WILLIAMS:  No, sir.

[STATE]:  That's probably the easiest way to have something beyond all doubt.

VENIREPERSON WILLIAMS:  One of the easiest ways, yes, sir.

[STATE]:  Okay.  And if you were there and you saw something occur that would make you a what?

VENIREPERSON WILLIAMS:  That would make me a witness if I was there and I saw it occur.

According to the State, Williams's answer indicated that he believed there were multiple ways to prove something beyond all possible doubt.  "Thus by giving an answer that said there were ways (other than actually being a witness to the crime themselves) to prove something beyond all possible doubt," Williams was "likely to hold the State to a much higher level of proof than people that understand that proof beyond all possible doubt is not possible without being a witness."  Because the law does not require the State to prove the allegations against Brandon beyond all possible doubt, it believed Williams would not be a good juror for the State.

15

Brandon argued that Williams's response "was very clear" that he understood the concept of "beyond all doubt" versus "beyond a reasonable doubt." Brandon did not discuss with Williams the concept of the State's burden of proof and did not ask him any additional questions.

In regard to this complaint, when the State was asked to present a race-neutral reason for striking Williams, it responded that it believed Williams might hold the State to a higher burden than was required. This is a race-neutral explanation. *Finley v. State*, 529 S.W.3d 198, 206 (Tex. App—Houston [14th Dist.] 2017, pet. ref'd).

Brandon was required to convince the trial court that the reason given by the State was not race-neutral and was merely a pretext for concealing discrimination. Based on Brandon's sole response, and without having delved into Williams's understanding of the State's burden any further, we cannot find that the trial court erred when it determined that the State's reason was not a pretext for concealing discrimination but was, instead, race-neutral.

Next, the State had an issue with Williams's answer to a hypothetical that was presented by defense counsel:

> Let's just say swing dance competition, dance hall competition. I know we've got folks that go to saloons. Okay? So let's say we're at a competition. Kelvin wins the $500 prize. I'm upset about that. So I come up to Kelvin and I say, "Hey, man, congratulations but I need that money." I need -- Kelvin is hesitant. Kelvin, again, "I need that money, man. Like I don't want to have to stab you. I need that money." Kelvin gives me the money. Now, is that aggravated robbery, if I never used or exhibited my, knife.

Williams answered, "That's -- I would need more information." Counsel responds, "Okay. You would need more information. But just based on that, if that's what I proved what happened, then your verdict should be what?" Williams said that, based on that, he would have to find the defendant not guilty. Then, counsel explained, "Okay. And the reason that -- the reason why

16

he's correct, no weapon was ever used or exhibited. Do you see what I mean? You've got to have every ingredient of the recipe."

Arguing that the State had a race-neutral reason for striking Williams, the State maintained that "it was somewhat concerning with the quick nature and the fact that [Williams] was in agreement with the hypothetical that [defense counsel] brought out." According to the State, the hypothetical was premised on the theory that having a deadly weapon on your person was not enough to constitute "use" of the weapon, even if you made threats to use the weapon. Expounding on its comment at trial, the State contends that its intended trial strategy was that Brandon's actions of implicitly threatening to harm Varnell by giving her a note that said he had a gun would be sufficient evidence to prove aggravated robbery, even without Brandon exhibiting the weapon. The State argues, "There is nothing improper in using one of your peremptory challenges to remove a potential veniremember who seems presupposed against your main theory of the case."

In his brief, Brandon contends that Williams's response to the hypothetical was "hardly hasty" due to the fact that he stated that "[he] would 'need more information'" before reaching a guilty verdict. Brandon also maintains that any other prospective juror who had disagreed with defense counsel's hypothetical would have been subject to the same challenge. For those reasons, Brandon concludes that the State's explanation was "implausible and pretextual."

The State contends that Brandon failed to preserve this issue for our review. We agree. The record shows that, as to this complaint, Brandon did not challenge the State's race-neutral explanation at trial. Even if Brandon had not waived his complaint on appeal, it remains without merit. The record reflects that, on the basis of Williams's answer to defense counsel's

17

hypothetical, it was conceivable that he would have expected the State to prove something that it was not required to prove, that is, that Brandon actually exhibited a deadly weapon during the robbery. Because the record offers some support for the State's race-neutral reason for striking Williams on this basis, we cannot conclude that the trial court clearly erred when it denied Brandon's *Batson* challenge.

The State also claimed that it was concerned about Williams's age, which was thirty-five. Claiming that people in their twenties and thirties usually have a slightly more liberal viewpoint about illegal drugs, the State maintained that jurors in their forties and fifties would be more beneficial to the State.

In response, Brandon argued that there were two young, non-African American women who had been seated on the jury; specifically, Alexander Schepleng, who was twenty-four and Breanna Robinson, whose age was not established. According to Brandon, "[Y]ou can't say that you're striking people because of their age and let someone on because of age." The State explained that it would have used a peremptory strike on Schepleng "but for her job, Texas Bank and Trust. She's a teller, which is the exact same profession as our victim in this case."

Brandon does not direct us to any cases, and neither have we found any, holding that there is a prohibition against using a peremptory challenge to exclude a potential juror based on their age.[8] Specifically, Brandon maintains that the State did not strike the two young, non-African American panel members who, according to the State's theory on age, would have been less favorable jurors for the State than Williams would have been. Yet, the State gave a

---

[8]In support of its position that it was not barred from using a peremptory strike based on Williams's age, the State cites *Campbell v. State*, 775 S.W.2d 419, 422 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd). In that case, as in this one, the State had reasons other than age to strike the particular panel members.

reasonable, race-neutral explanation as to why it chose not to use a peremptory strike on Schepleng, i.e., that she was employed as a bank teller and very likely would have been especially concerned with crimes occurring in banks and crimes that directly involved individuals working in her specific position. Consequently, she would have been a satisfactory juror for the State.

On the other hand, the record is unclear as to Robinson's age or whether the State had an additional reason to keep her on the jury. However, Brandon's complaint was based entirely on the fact that, if the State's explanation concerning Williams's age was race-neutral, the State would have used a peremptory strike against Robinson. "'Disparate treatment,' as such, cannot automatically be imputed in every situation where one of the State's reasons for striking a venireperson would technically apply to another venireperson whom the State found acceptable." *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992).

That said, because the trial court was in the best position to determine if the State's concern about Williams's age was genuine, and because we give a high degree of deference to the trial court's decision in that regard, we cannot conclude that the trial court's denial of Brandon's *Batson* challenge was clearly erroneous.

At trial, the State questioned the panel members as to whether they had any family members or close friends who had had "significant criminal troubles." Williams indicated that, when he was young, his uncle had been "in and out of jail a lot." When asked if he could be fair and impartial, Williams responded, "I can be fair and impartial, yes, sir."

The State contends that, based on his brother's criminal history, Williams could have been unfairly biased in favor of Brandon. Texas courts have held that a strike of a prospective

19

juror on the basis that he or she has a family member or close friend who has been arrested, charged, or convicted of a crime is race-neutral. *See Murray v. State*, 861 S.W.2d 47, 52 (Tex. App.—Texarkana 1993, pet. ref'd); *Garcia v. State*, 833 S.W.2d 564, 567 (Tex. App.—Dallas 1992), *aff'd on other grounds*, 868 S.W.2d 337 (Tex. Crim. App. 1993); *Sims v. State*, 768 S.W.2d 863, 865 (Tex. App.—Texarkana 1989), *pet. dism'd per curiam by* 792 S.W.2d 81 (Tex. Crim. App. 1990). Yet, Brandon maintains that other non-African American panel members stated that they had family members with criminal histories, but the State did not use peremptory strikes against them.

First, Brandon points to Bradford Laster, a non-African American panel member who had been in jail or on community supervision "[a] while back." Laster also explained that his brother had been in trouble with the law. Brandon claims Laster indicated that he did not believe his brother had been treated fairly.[9] According to Brandon, "[O]ne would have been perceived by the State as a more objectionable juror than Williams." Yet, Laster also stated that he could put aside his feelings in regard to his brother's treatment and be a fair and impartial juror if he was selected to sit on the jury.

The State argues that it had another reason for not using a peremptory strike against Laster.[10] During jury selection, when defense counsel addressed the intent element of possession of a controlled substance with intent to deliver, in particular, the difference between "personal use" and "dealer use," Laster explained, "Well, you know, if you've got a little small bag of dope

---

[9]Brandon contends Laster said his brother was not treated fairly. When asked if he thought his brother had been treated fairly, Laster responded, "Huh-uh." Whether that is a negative answer is questionable.

[10]According to the State and the record, the State struck seven other panel members who had family or friends with a criminal history.

20

then that's going to be personal. If you've got a big bag of dope, you're probably going to be selling some of it."

First, "'[d]isparate treatment,' as such, cannot automatically be imputed in every situation where one of the State's reasons for striking a venireperson would technically apply to another venireperson whom the State found acceptable." *Cantu*, 842 S.W.2d at 689. In addition, the State had a reasonable explanation as to why it did not use a peremptory strike against Laster. Because the State planned to rely on the amount of drugs found in Brandon's car to prove the intent element of one of the charged crimes, Laster's answer gave the State a good reason to keep him on the jury.

Brandon also complains that the State did not strike Robert Elley, a non-African American panel member who indicated that he had a criminal history. Again, "'[d]isparate treatment,' as such, cannot automatically be imputed in every situation where one of the State's reasons for striking a venireperson would technically apply to another venireperson whom the State found acceptable." *Id.* That said, regardless of his past, Elley stated that he could be a fair and impartial juror. Notably, when asked if he believed he had been treated fairly by law enforcement, Elley responded, "[It was a] long time ago. In retrospect, yes." On that basis, the State could have reasonably believed that Elley would be an acceptable juror for the State or, at the very least, would not have been adverse to it.

The State had at least four concerns regarding whether Williams would be a suitable juror in this case. And, although Brandon compared Schepleng, Robinson, Laster, and Elley to Williams, the State had only two concerns as to one or two of them, and only one concern or no concern at all, as to the remaining individuals. It is not surprising that the State would choose to

21

strike Williams based on multiple reasons, rather than the other individuals of which it had fewer concerns. That fact diminishes Brandon's arguments somewhat and weighs in favor of the trial court's finding that the State did not strike Williams on the basis of race but, instead, on several race-neutral reasons.

The trial court found that the State's reasons for striking Williams were racially neutral and that the strike against him was not motivated by a desire to eliminate a particular racial group from service on the jury. Because the trial court was in the best position to determine the veracity of the State's explanations, and because we give a high degree of deference to the trial court's decision in regard to *Batson* challenges, we cannot conclude that the trial court's denial of Brandon's *Batson* challenge regarding Williams was clearly erroneous

### 2. Latanya Sammons

Brandon also complains that the State struck Sammons, another African American panel member, on the basis of race. During jury selection, Sammons stated that her brother had a criminal history that involved a drug offense. In response to Brandon's *Batson* challenge, the State explained,

> And, my investigator pointed out I should probably have struck [Sammons] for cause. When she was talking about her brother I believe and his drug usage and whether she can be unbiased, for some reason I didn't write down for cause, but she said that she could not be fair and impartial based on that prior interaction. That -- and I asked the question in a weird manner, and I guess out of an abundance of caution, you know, so the fact that she couldn't put her family's drug use behind her. And we've also struck quite a few others for that exact reason.

Brandon's counsel did not respond to the State's reasoning but, instead, said, "Judge, if I may just go back to [another panel member]." The trial court told counsel to "[g]o ahead." Counsel

22

did, however, address the State's strike against Sammons a few minutes later by informing the trial court that Sammons said she could be an impartial juror, not that she could not be one. Other than that, Brandon made no further argument in regard to Sammons.

On appeal, the State concedes that, in fact, Sammons had said she could be a fair and impartial juror despite her brother's criminal history. Citing *Greer v. State*, 310 S.W.3d 11 (Tex. App.—Dallas 2009, no pet.), Brandon contends, "[W]hen the State's explanation for striking a juror is clearly contrary to the evidence, . . . there is no innocent mistake," and the appellate court must reverse the trial court for "*Batson* error." *See id.* at 16. Citing *Johnson v. State*, 06-98-00279-CR, 1999 WL 409385, at *1 (Tex. App.—Texarkana June 22, 1999, no pet.) (mem. op., not designated for publication), the State argues that "a peremptory challenge motivated by an honest, racially neutral reason, although a mistaken one, is not racially motivated."[11] *See id.*; *see also Salinas v. State*, 888 S.W.2d 93, 98 (Tex. App.—Corpus Christi 1994, pet. ref'd); *Jack v. State*, 867 S.W.2d 942, 947 (Tex. App.—Beaumont 1993, no pet.).

We need not address Brandon's complaint regarding the State's explanation because, as the State points out, it had race-neutral reasons for striking Sammons. First, the State argued that Sammons hesitated before she committed that she could be a fair and impartial juror. According to the State, Brandon conceded that Sammons hesitated when answering the question. The record shows that Brandon's counsel stated, "But -- because there was some hesitancy when [he] asked about her -- somebody -- I think it was her brother and him being charged with a crime.

---

[11]Without addressing the issue any further, the record shows that there may have been some difficulty hearing Sammons's answer.

But she did say she could be fair." The State contends that this reason, alone, was enough to strike Sammons from the jury.

In addition, Sammons stated that her brother had been involved in a drug offense that happened to be similar to two of the four offenses of which Brandon had been charged. Texas courts have held that a strike of a prospective juror on the basis that he or she has a family member or close friend who has been arrested, charged, or convicted of a crime is race-neutral. *Murray*, 861 S.W.2d at 52; *Garcia*, 833 S.W.2d at 567; *Sims*, 763 S.W.2d at 865. The State also points out that it used three of its four peremptory strikes against other panel members who stated that they had family or friends who had some type of criminal history.

On this record, the trial court could have reasonably concluded that the State's race-neutral explanations were genuine and that the peremptory strike against Sammons was not racially motivated. As a result, we find no clear error in the trial court's denial of Brandon's *Batson* challenge as to Sammons.

We, therefore, overrule Brandon's third point of error.

## IV. The Trial Court Erred by Assessing Duplicative Court Costs

Next, Brandon contends that the trial court erred by assessing court costs in both the judgment in this cause that resulted from Brandon's conviction of aggravated robbery and the judgment of conviction on appeal in cause number 06-21-00086-CR.

"If the punishment is any other than a fine, the judgment shall specify it, and order it enforced by the proper process. It shall also adjudge the costs against the defendant, and order the collection thereof as in other cases." TEX. CODE CRIM. PROC. ANN. art. 42.16 (applicable

24

when punishment is anything other than a fine); *Johnson v. State*, 423 S.W.3d 385, 389 (Tex. Crim. App. 2014). Article 102.073 of the Texas Code of Criminal Procedure provides:

> (a)    In a single criminal action in which a defendant is convicted of two or more offenses or of multiple counts of the same offense, the court may assess each court cost or fee only once against the defendant.
>
> (b)    In a criminal action described by Subsection (a), each court cost or fee the amount of which is determined according to the category of offense must be assessed using the highest category of offense that is possible based on the defendant's convictions.
>
> (c)    This article does not apply to a single criminal action alleging only the commission of two or more offenses punishable by fine only.

TEX. CODE CRIM. PROC. ANN. art. 102.073. Simply stated, when a defendant is convicted of two or more offenses in a single criminal action,[12] the trial court must assess each court cost or fee only once against the defendant. *See* TEX. CODE CRIM. PROC. ANN. art. 102.073(a); *see also Cain v. State*, 525 S.W.3d 728, 733–34 (Tex. App.—Houston [14th Dist. 2017, pet. ref'd) (trial court erred in assessing "identical overlapping" or duplicative costs against defendant). When a trial court erroneously assesses duplicative court costs for multiple convictions tried in a single criminal action, we retain court costs for the offense of the highest category.[13] TEX. CODE CRIM. PROC. ANN. art. 102.073(b).

Here, because Brandon was convicted of two or more offenses in a single criminal action, the trial court could order payment of court costs only once. *See* TEX. CODE CRIM. PROC. ANN.

---

[12]"In a single criminal action" has been construed to mean allegations and evidence of two or more offenses that are presented in a single trial or plea proceeding. *See Hurlburt v. State*, 506 S.W.3d 199, 201–03 (Tex. App.—Waco 2016, no pet.). Here, there is no dispute that the two separate cases against Brandon were tried in a single criminal action.

[13]Brandon was convicted of a first-degree offense in each case—aggravated robbery and possession of a controlled substance with intent to deliver.

25

art. 102.073(a); *Cain*, 525 S.W.3d at 733–34. The State agrees that Brandon should not be assessed court costs in both causes, but it disputes Brandon's contention that the fees and court costs should be deleted from the judgment on appeal in cause number 06-21-00085-CR rather than the judgment at issue in this cause. We agree with the State.

The record shows that Brandon was assessed fees and costs in the amount of $330.00 as a result of the aggravated robbery conviction. In regard to Brandon's conviction of possession of a controlled substance with intent to deliver, the trial court assessed fees and costs in the amount of $390.00. The State is entitled to all properly assessed fees and costs, but it may not recover duplicative costs. Because the trial court assessed a higher amount of fees and court costs for the possession of a controlled substance with intent to deliver conviction, the State was entitled to $390.00 in court costs. As a result, we must delete the $330.00 fees and costs from the judgment of conviction at issue in this appeal and from the associated bill of costs.

Accordingly, we sustain Brandon's fourth point of error.

## V.    The Trial Court Erred When It Cumulated the Fines

In his fifth point of error, Brandon contends that the trial court erred when it ordered fines in each of his four convictions but did not order the fines to run concurrently.[14]

In its judgment of conviction of aggravated robbery, the trial court ordered Brandon to pay a fine of $10,000.00. It also ordered Brandon to pay (1) a $10,000.00 fine on his conviction of possession of a controlled substance with intent to deliver (referred to as Count I), (2) a $5,000.00 fine on his conviction of possession of a controlled substance (referred to as Count II), and (3) a $10,000.00 fine on his conviction of unlawful possession of a firearm by a felon

_____

[14]The State did not respond to this issue.

26

(referred to as Count III).[15]  Although the trial court ordered his sentences to run concurrently, it did not order the fines to run concurrently.

The Texas Penal Code requires sentences for offenses arising out of the same criminal episode that are prosecuted in a single criminal action to be served concurrently.  TEX. PENAL CODE ANN. § 3.03(a).  When a trial court orders sentences to run concurrently, the judgment should not reflect a cumulated fine.  *See State v. Crook*, 248 S.W.3d 172, 177 (Tex. Crim. App. 2008) (holding that the concurrent sentence provision in Section 3.03 applies to the entire sentence, including fines); *see also Habib v. State*, 431 S.W.3d 737, 742 (Tex. App.—Amarillo 2014, pet. ref'd) (deleting cumulated fine from the second judgment).

Accordingly, we delete the following fines from the judgment of conviction and the clerk's bill of costs at issue in our cause number 06-21-00086-CR:   the $10,000.00 fine associated with Brandon's conviction of possession of a controlled substance with intent to distribute (Count I), the $5,000.00 fine associated with Brandon's conviction of possession of a controlled substance (Count II), and the $10,000.00 fine associated with Brandon's conviction of unlawful possession of a firearm by a felon (Count III).[16]  The fine of $10,000.00 associated with Brandon's conviction of aggravated robbery at issue in this appeal remains in the judgment of conviction and in the clerk's bill of costs.

As a result, we sustain Brandon's fifth point of error.

---

[15]These three convictions were tried in cause number 47992-A and appealed in our cause number 06-21-00086-CR.

[16]We also address this issue in our cause number 06-21-00086-CR.

**VI.      The Trial Court Erred by Assessing Time Payment Fees**

In his sixth point of error, Brandon maintains that the trial court erred when it assessed time payment fees in this case.  We agree.

The Texas Court of Criminal Appeals has recently concluded that a time payment fee like the one imposed in this case "must indeed be struck for being prematurely assessed because a defendant's appeal suspends the duty to pay court costs and therefore suspends the running of the clock for the purposes of the time payment fee."  *Dulin v. State*, 620 S.W.3d 129, 129 (Tex. Crim. App. 2021).  "As a consequence, even now, assessment of the time payment fee in this case would be premature because appellate proceedings are still pending."  *Id.*  The State concedes this point.[17]

Here, Brandon asks this Court to strike "the $15 time payment fee (included as part of the total costs)."  The time payment fee in the amount of $15.00 was included as a part of the $330.00 court costs assessed against Brandon in this matter.  As previously discussed, we have deleted the court costs in Brandon's judgment of conviction and from the bill of costs associated with that conviction.  The assessed time payment fee was included in the deleted court costs.

Accordingly, we sustain Brandon's sixth point of error.

**VII.      Brandon's Plea to Enhancement Paragraphs**

We have the authority to modify the judgment to make the record speak the truth, even if a party does not raise the issue.  TEX. R. APP. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992).  "Our authority to reform incorrect judgments is not dependent on the

---

[17]Brandon also argues that the time payment fee statute is unconstitutional.  Because we have found that the assessment of the time payment fee was premature, we decline to address that argument.

request of any party, nor does it turn on a question of whether a party has or has not objected in [the] trial court; we may act sua sponte and may have a duty to do so." *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.) (citing *Asberry v. State*, 813 S.W.2d 526, 531 (Tex. App.—Dallas 1991, pet. ref'd)).

Here, the trial court's judgment erroneously reflects that Brandon pled "not true" to the State's enhancement paragraph. In fact, he pled "true" to the allegation. Where there is no reversible error, we have the authority to modify judgments and affirm, as modified. *Walker v. State*, 557 S.W.3d 678, 690 (Tex. App.—Texarkana 2018, pet. ref'd). We modify the trial court's judgment by changing Brandon's plea of not true to the State's enhancement paragraph to a plea of true.

## VIII. Conclusion

For the reasons above, we modify the judgment of conviction and the bill of costs by deleting the $330.00 assessment of court costs, and we modify the judgment of conviction by changing the notation of Brandon's plea to the State's enhancement allegation from not true to true. As modified, we affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:     April 5, 2022
Date Decided:       June 22, 2022

Do Not Publish